Ruffin, J.
The Court considers the first instruction right. The offence consists in the second marriage, and therefore it must be truly laid, in respect of the place, and the indictment must be in the same county. The first marriage must, indeed, be set forth; because the second marriage is criminal, by reason only, that the first wife was living. But, if she was living, the crime is complete, without regard to the place where the first marriage was had. Therefore, although time and placeare, according to the precedents, usually annexed to every fact alleged in an indictment, yet, in this instance, neither is material, and the one need not be proved, as laid, more than the other; but it is sufficient to show, that, at some time before the alleged second marriage, there was at some place the alleged first marriage.
The second point depends upon the meaning to be given to the marriage act, Rev. St. c. 71. It enacts that all regular ministers of the Gospel, of every denomination, having the cure of souls, shall be authorized to solemnize the rites of matrimony, according to the rites and ceremonies of their respective churches, and agreeably to the rules in the act prescribed. It then prescribes that marriage shall be by license, or by publication of bans by any minister of the Gospel, qualified as in the act before prescribed. It was not directly stated, by the witness in this case, that he was such a minister as had power, according to the rules of his church, to join in wedlock, nor in what grade of the ministry of that church he was. He called himself a ‘(licensed preacher,” and then “a regular minister,” and said he occasionally preached in Methodist churches, but had not the charge of any church or congregation in particular; and he did not set forth that he had ever performed any other ministerial act besides that of preaching, or had the authority of the church to do so» It seems to the Court, it did not sufficiently appear, that the- *292 witness was qualified to marry persons, by being a regular minister of the Gospel of the Methodist denomination, having the cure of souls. It is not supposed by the Court, that the cure of souls, as used in the act, implies a necessity, that the minister should be the incumbent of a church living, or the pastor of any congregation, or congregations in particular. But those terms import, that the person is to be something more than a minister or preacher merely ; and that he has faculty, according to the constitution of his church, to celebrate matrimony, and to some extent, at least, has the power to administer the Christian sacraments, as acknowledged and held by his church. We know not how less force can be allowed to those terms, if any meaning is to be given to them; and a comparison of those terms, with those read in the previous statutes, and with the state of the common law, on this subject, shows it to be, probably, the true meaning of them.
By the marriage act of 1741, Davis’ Rev. 56, the rites of matrimony might be celebrated by ‘‘every clergyman of the Church of England,” and for want of such, by any lawful magistrate within this government, by license or “ by the publication of bans as prescribed in the Rubrick in the book of Common Prayerthe magistrate, however, not to marry, under a penalty, “in any parish where a minister shall reside and have a cure,” without permission from such minister, and “ the minister having the cure of any parish,” and not refusing to perform the ceremony, to have the fees for marriages, in the parish, by any other person. In an act in 1765, for establishing an orthodox clergy, provision of a salary and also of fees, including fees for marrying by license or bans, was made for “ every minister prepared to or received into any parish, as incumbent thereof,” but any clergyman “ presented to a parochial living” was for crime or immorality made subject to suspension by the Governor from “serving the cure of such parish, whereof he was *293 incumbent,” and from the salary, until the Bishop of London should resl ore him, or by sentence deprive him. Davis’ Rev. 338. By an act of 1766, to amend the marriage act of 1741,. it was recited, that the “Presbyterian, or Dissenting Clergy,” conceiving themselves not to be included in the restriction in that act, in respect to license, or bans, had joined persons in matrimony without either license or publication, whereby the payment of the fees had been eluded, and the validity of marriages endangered: and thereupon it was declared, that, the previous marriages by any of the Dissenting, or Presbyterian Clergy, in their accustomed manner,, should be as effectual as if performed by any minister of the Church of England; and also enacted, that after the 1st of January 1767, it should be lawful for any “Presbyterian minister, regularly called to- any Congregation in the Province, to celebrate the rites of matrimony between persons in their usual accustomed manner,” under the same rules as any magistrate might celebrate them, by license or bans, with a proviso, that the minister o.f the Church, of England, serving the cure of the parish, “ should have the fees, if he did not refuse to do the service thereof” Davis’ Rev. 350 Next came the act of 1778, which recited, that, it is absolutely necessary, that rules should be observed concerning the celebrating the rites of matrimony, and then enacted in the words, re-enacted in 1836, and already quoted from the Revised Statutes, with a proviso, “ that the People, called Quakers, shall still retain their former rules and privileges in solemnizing the rites of matrimony in their own Church It is thus seen, that at the first the Clergy of the established Church, only, could celebrate matrimony. But the power was not confined to an)r portion of them. It was vested in “ every Clergyman of the Church of England,” though the fee belonged to “ the minister serving the cure of the parish,’’ or “ the incumbent of the parish,” as he is indifferently called in the several parts of the Statutes. That *294 church was then established here by law, and therefore it is judicially known, that each of the three orders of its ministry was conferred by ordination, and that one in the lowest of them, that oí deacon, could be the rector of a parish, and celebrate the rites of matrimony, according to the Rubrick of the church, and, therefore, according to the provincial Statutes. Each of them had, by ordination, the faculty of baptism and the cure of souls and was a clergyman, though not presented to a parochial living,” or, not “ serving the cure of any parish,” or, not “having the cure of a parish,” or not being “ the incumbent of a parish,” that is, in possession of a benefice or church preferment. The acts clearly recognize in that church the distinction between the cure oí souls, and the cure of a parish; for the authority to perform the ceremony belonged to every Clergyman, whether Bishop. Priest, or Deacon. When extended to the Presbyterian ministers, it was conferred, not on all, but on those “ regularly called to congregation,” that is, called according to the rules ot that church ; and they were to celebrate the rites, “ in their usual, and accustomed manner,” that is, according to the power and authority to perform the office; and of the actual settlement of the minister as pastor of some congregation. It did not prevent the celebration by any dissenting ministers, as they were called by the church of England, but the Presbyterians. At that time there were but few others here; and the society, now denominated the Methodist Church, was hardly known here, and the small body then existing had not, either in England, or this county, separated from the Establishment. But soon afterwards, and especially v^hen the revolution overturned the Establishment, and scattered the clergy, that religious society, and others, increased rapidly, and have since numbered great multitudes. The progress towards this result was seen, while it was still deemed necessary that matrimony should be celebrated by some rules ; and the legislature thought it *295 convenient, that those, who looked to a religious rite as a blessing on their nuptials, should not be restricted to the narrow limits of settled Presbyterian ministers and the Clergy of the Church of England — the latter of whom, indeed, had become inaccessible here, literally speaking. Therefore the act of 1778 drops the terms “ Clergy of the Church of England,” “ Presbyterian ministers,” “ cure of a paidsh,” “ called to a congregation,” and, instead of them, embraces “all regular ministers of the Gospel of every denomination,” with only this qualification, that they should have “ the cure of souls, and celebrate the rites of matrimony according to the rites and ceremonies ot their respective churches.” To this qualification some effect must be given. It is plain, that every minister of a religious society is not necessarily embraced, else the latter words would not have been found in the act at all. For, a person may be licensed to read the scriptures in the congregation, or to read or say prayers, or to preach, and yet not be a regular minister of the Gospel in his denomination, with cure of souls, because he has not been ordained, by the constituted authorities of his church, to the office of administering all or any part of the christain sacraments, and thus have the care of souls, as acknowledged and held by his church. The act ought to be thus understood, because, under the law as it stood before, there was that distinction between the cure of souls, and the cure of a parish, as we have seen. The Statute, without assuming to pronounce dogmatically, who were true ministers of the Gospel, meant to give a catholic rule, by admitting every one to be so, to this purpose, who, in the view of his own church, hath the cure of souls by the ministry of the word, and any of the sacraments of God, according to its ecclesiastical polity'; implying spiritual authority to receive or deny any desiring to be partakers thereof, and to administer admonition or discipline, as he may deem the same to be to the soul’s health of the person, *296 and the promotion of godliness among the people. When to such a ministry is annexed, according to the Canons, or Statutes of the particular church, the faculty of performing the office of solemnizing matrimony, the qualification of the minister is sufficient, within the Statute. That seems to be the meaning of the act, as far as it can be discovered from its own language or that of preceding Statutes, or to be gathered from the political or religious state of the country, existing or expected, when it was passed. That is rendered the more probable by the proviso respecting the Quakers. That religious denomination, it is generally understood, have not ministers, in the sense in which other's, who profess tobe Christian Churches, use that term: meaning those who, by open vows, take on themselves the ministry of the sacraments or sacrament, and are set apart, and ordained by due authority of the church, to that office. They have, we believe, preachers, but not pastors, nor ministers. Hence, among them, the provision is not that “ their ministers” may celebrate the rites of matrimony between their members, or others, but that, u the Quaker People” shall retain their former privileges of marrying in their own church ; which raises an inference, in respect to other denominations, of the correctness of the construction and rule first laid down.
. It was not necessary, therefore, to the validity of the marriage, that the witness should appear to have been a minister in charge of a church, or the rector of a parish, or pastor of a particular flock But it is necessary, that he should have appeared to be a minister, capable of entering 'upon the duties of such a charge, according to the ecclesiastical economy of his church, with the faculty of celebrating, the rites of matrimony. Perhaps, that ought to have appeared, affirmatively, either upon the evidence of the'witness,.or otherwise. ..At all events, if -his capacity in that respect was left doubtful upon the evidence, it was *297 erroneous to instruct the jury, that the witness was compe» tent. To make the most of the evidence, the point was left doubtful. There was no evidence that the witness had ever married any persons, or would be allowed by his church to do so. And upon enquiry from respectable ministers, and others, versed in the constitution of that church, and looking into their Book of Discipline, it is found to be uncertain, whether the witness had the authority to marry or not. It seems that marriage may be solemnized by any minister, and that their ministry consists of elders and deacons, ordained by the bishop, and that of these there is a. sub-division, into travelling and local preachers : that the travelling elder may administer baptism and the Lord’s Supper, and perform the office of matrimony, and all parts of divine worship ; and that the travelling deacon may baptize and perform the office of matrimony in the absence of the elder, and assist the elder in administering the Lord’s Supper. But we are not informed whether the local deacons and elders are ordained to those offices with the like duties and powers with those in the travelling connexion. And, besides, there is another class of persons, called “licensed preachers,” who are not ordained, and have no spiritual jurisdiction or faculty to administerany sacrament, as to marry, but only<£ to preach,” under a license from the Quarterly Conference, “composed of travelling and local preachers, exhorters, stewards, and class leaders of the circuits and stationswhich license lasts but for one year, and must be renewed annually for four years, to render the person eligible to the office of a local deacon. It must be understood that the witness was not a travelling elder or deacon, since to them belongs the charge of the different churches. He was, therefore, either a licensed preacher, or a local preacher; and in the former case he was certainly not authorized to marry: and in the la-t- ' *298 ter, it cannot be told whether he was or not. Therefore it is proper the cause should go to another jury, where the true character of this person’s ministry may be shown.
Pee Curiam. Judgment reversed, and venire de novo.