STATE OF NORTH CAROLINA v. JAMES ROBERT LYNCH

No. 31

(Filed 2 December 1980)

**Bigamy § 2; Marriage § 2— ceremony not performed before proper minister — no valid marriage — no bigamy**

A ceremony solemnized by a Roman Catholic layman in the mail order business who bought for $10 a mail order certificate giving him "credentials of minister" in the Universal Life Church, Inc. was not a ceremony of marriage to be recognized for purposes of a bigamy prosecution in the State of N.C. G.S. 51-1, G.S. 14-183.

Justice BROCK took no part in the consideration or decision of this case.

DEFENDANT appeals pursuant to G.S. 7A-30(2) from decision of the Court of Appeals, 46 N.C. App. 608, 265 S.E. 2d 491 (1980), finding no error in his bigamy conviction before *Walker* (*Hal H.*), *J.*, at the 23 February 1979 Session of FORSYTH Superior Court.

Defendant was tried upon a bill of indictment charging him with the crime of bigamy.

The State offered the testimony of three witnesses and three exhibits as evidence of the crime. The witnesses were the alleged first wife of defendant and the two men who performed marriage

ceremonies in which defendant was the groom. The three exhibits were a certificate of ordination as minister in the Universal Life Church, Inc., held by the man who officiated over the first ceremony of marriage, a certificate of marriage for the first marriage certified by a deputy register of deeds of Davidson County to have occurred 28 October 1973 and a copy of an application, license and certificate of marriage for the second marriage certified by an assistant register of deeds of Forsyth County to have occurred 8 July 1978. The State's evidence can be summarized as follows:

On 28 October 1973, after living together for a year, defendant and Sandra Lynch participated in a marriage ceremony over which Sandra's father, Chester A. Wilson, officiated in his home in the presence of Sandra's mother, daughter, sister and three friends, two of whom signed the marriage license as witnesses. Vows of marriage and rings were exchanged by defendant and Sandra. The rings were borrowed from Sandra's sister and brother-in-law and later returned to them. After the ceremony, defendant and Sandra went on a weekend trip to the mountains, which defendant referred to as a honeymoon. They returned to Clemmons, North Carolina, where they resided and held themselves out as husband and wife until November 1977 when Sandra returned to the home of her father. As of the time of trial, Sandra knew of no legal proceeding whereby defendant had obtained a divorce from her. Sandra is a member of the Roman Catholic Church.

Chester A. Wilson, the father of Sandra Lynch, performed the 28 October 1973 marriage ceremony between defendant and his daughter at the request of defendant. At the time he performed the ceremony, Wilson was--and still is--a lay member of the Roman Catholic Church and ran a mail order business. He also held the "credentials of minister" of the Universal Life Church, Inc. of Modesto, California. Wilson produced an eight by eleven inch certificate to that effect on which appeared the following printed matter:

## UNIVERSAL LIFE CHURCH, INC.

Headquarters: 1766 Poland, Modesto, Calif. 95351
537-0553

## CREDENTIALS
of Minister

This is to certify that the bearer hereof CHESTER A. WILSON of WINSTON SALEM State or Province of NORTH CAROLINA *has been ordained by Universal Life Church, Inc. this day 7 January* 1973,

Board Members
Auddie A. Gardner
Rev. Susetta Lykins
Al DeBettencourt
Lida G. Hensley, Secretary

(SEAL) s / KIRBY J. HENSLEY
President--Kirby J. Hensley, D.D.

To obtain these credentials of minister, Wilson mailed his name, address and ten dollars to the California headquarters. He has never been through any further proceedings or training with the Universal Life Church, Inc. Wilson applied for membership after becoming a born-again Christian and does not use his Universal Life Church, Inc., affiliation for tax purposes. He officiates over no church. According to Wilson, the Universal Life Church, Inc., has seven million ministers and permits memberships in any other religious organization, a consequence of which is his continued participation in the activities of his local parish of the Roman Catholic Church. Wilson stated, "the Universal Life Church will ordain anyone without question of his or her faith for life." Wilson has not performed any ceremony of marriage other than the one between defendant and his daughter.

On 8 July 1978, Clayton H. Persons, an ordained minister of the Moravian Church, performed a ceremony of marriage between Mary Alice Bovender and defendant at the home of the bride. The ceremony was that customary in the Moravian Church. Persons performed the ceremony with the knowledge that a lay Catholic person performed some ceremony between defendant and another. According to Persons, such a ceremony would be very clearly invalid under Moravian Church doctrine and under Roman Catholic doctrine as verified to Persons by two local priests of the Roman Catholic Church. Persons could not recall when defendant told him the lay Roman Catholic was also a member of the Universal Life Church, Inc., and he could not remember being told the man was an "ordained minister" of the Universal Life Church, Inc. Persons stated: "If Mr. Lynch had told me that the person who performed the first marriage and who claimed to be an ordained

minister was a lay member of the Roman Catholic Church, I would have performed the ceremony; and in fact, I did so so."

Defendant's evidence consisted of his own testimony and literature concerning the Universal Life Church, Inc. Defendant's testimony and significant information from the document can be summarized as follows:

Defendant lived with Sandra Lynch for five years--one before the 23 October 1973 ceremony and four years afterwards. Defendant intended the 1973 ceremony to be a marriage and he considered Sandra his wife until their November 1977 breakup. He had not seen Wilson's credentials of minister. Wilson did tell defendant he had such a certificate which he got through the mail from California. He did not know that Wilson, with whom he cursed, drank and gambled on cards and dogs, considered himself a born-again Christian. Both the 1973 and 1978 ceremonies were done freely and voluntarily on defendant's part. Based on conversations with Persons and his attorney, he considered the first marriage null and void. Defendant claimed the first knowledge he had that Sandra Lynch felt she was still married to him was when he was arrested for bigamy. The State, on cross-examination, introduced a letter dated 19 April 1978 to Sandra Lynch from defendant's attorney which read in part:

> Please be advised that I have been retained by your husband, James Roberts Lynch, to obtain a final decree of divorce for him. I have enclosed a special power of attorney for your signature which would allow Mr. Lynch to obtain a divorce in the Dominican Republic without the necessity of court costs and an action here in North Carolina. If you are in agreement, please sign the enclosed in the presence of a notary public and return the form to me in the enclosed envelope.

> In the event you do not sign this form and return it to me, it will be necessary for me to file an action here in North Carolina and obtain a final decree of divorce through the courts here in Forsyth County. I am sure that you can see that signing the form and obtaining the divorce in the Dominican Republic would save everyone involved time and expense.

Defendant presented a front and back printed circular entitled

"The Universal Life Church," under which appeared a California address. The circular contained a clip-out coupon to send for ordination. Among the large print type statements are the following: "FREEDOM! The Universal Life Church believes only in what is right . . . and every person has the right to decide what is right for him; We have 7 Million Ministers and over 30,000 Churches; We are one Church! Advocates of the Good Life; Our Goal--A fuller life for everyone; Our Objective--Eternal progression; Our Slogan--To live and help live." Within the finer print appears the following:

> The Universal Life Church, Inc., has no traditional doctrine. We, as an organization, only believe in that which is RIGHT. Each individual has the privilege and responsibility to determine what is RIGHT for him/her as long as it does not infringe on the RIGHTS of others. We do not stand between you and your God. We are active advocates of the First Amendment of the United States of America....

> The ULC will ordain anyone, without question of his/her faith, for life. We ordain them according to St. John 15:16. ULC ministers have the authority to officiate at marriages, baptismals, funerals, conduct church meetings, administer "last rites." Every right and privilege accorded other ministers is accorded the ULC minister. We do not require you to give up your membership with any other church to be a minister of the ULC, Inc.

> REMEMBER--a church is PEOPLE, not a building. Church meetings may be held in your home, apartment, on top of a mountain, in a park or wherever the Board of Directors decide. The meeting place may or may not be owned by the church. A church function can take place "wherever two or more people are gathered together." There is no obligation to have a special building to perform marriages, funerals, baptisms, etc. We urge that you strive to have a building at sometime for your services, a building of your own.

According to the circular offered in evidence at trial of this case, the twenty-seven titles offered by the Universal Life Church, Inc., include that of Archpriest, Bishop, Dervish, Guru, Rev. Mother, Preceptor, Brahman and Universal Religious Philosopher. Among the courses offered by Universal Life Church, Inc., are a course

resulting in an Honorary Doctor of Divinity degree (DD) for $20.00, a course resulting in a Doctor of Universal life degree (DUL) for $15.00, a course entitled the "the SOUL Clinic" (Science of Understanding Life) for $100.00, a course resulting in a Doctor of Religious Science degree (DRS) for $35.00, a course on American Church Law and Parliamentary Procedure which teaches the legal rules and principles concerning separation of church and state which results in a Doctor of Religious Humanities degree (DRH) for $40.00 and a course which results in a Doctor of Metaphysics degree (MSD) for $10.00. A Doctor of Philosophy in Religion is given for $100.00. The circular contains a "suggested ULC marriage service" and information regarding church charters and religious exemptions from tax and social security. All titles are bestowed without question upon any person who remits the indicated amount.

Upon this evidence, the jury convicted defendant of bigamy. The Court of Appeals found no error with Wells, J., dissenting. Defendant appealed to the Supreme Court as of right pursuant to G.S. 7A-30 (2).

*Rufus L. Edmisten, Attorney General, by Norma S. Harrell, Assistant Attorney General, for the State.*

*Eubanks, Walden & Mackintosh by Bruce A. Mackintosh, attorney for defendant appellant.*

HUSKINS, Justice.

The question we address upon this appeal is whether the evidence of the crime of bigamy is sufficient to withstand defendant's motion for nonsuit. We hold the evidence insufficient to go to the jury, and defendant's motion for nonsuit should have been granted.

Upon a motion for nonsuit in a criminal action, all of the evidence favorable to the State, whether competent or incompetent, must be considered. Such evidence must be taken as true and considered in the light most favorable to the State. Discrepancies and contradictions are disregarded, and the State is entitled to every inference of fact which may reasonably be deduced therefrom. *State v. Witherspoon,* 293 N.C. 321, 237 S.E. 2d 822 (1977).The test is the same whether the evidence is circumstantial, direct or both. *State v. McKnight,* 279 N.C. 148, 181 S.E. 2d 415 (1971). If the evidence is sufficient only to raise a suspicion or conjecture, the motion for nonsuit should be allowed. "This is true even though the

suspicion so aroused by the evidence is strong." *State v. Cutler*, 271 N.C. 379, 383, 156 S.E. 2d 679, 682 (1967).

Bigamy is a statutory crime in all fifty states. *See* Slovenko, *The De Facto Decriminalization of Bigamy*, 17 J. of Fam. L. 297, 307-08 (1979) (Appendix contains a list of bigamy statutes). Bigamy was not an offense at common law. It was an offense against society punishable under ecclesiastical law. *State v. Burns*, 90 N.C. 707 (1884); 4 W. Blackstone, Commentaries * 163; *but see, State v. Williams*, 220 N.C. 445, 17 S.E. 2d 769 (1941), *rev'd on other grounds*, *Williams v. North Carolina*, 317 U.S. 287, 87 L.Ed. 279, 63 S.Ct. 208 (1942). It was made a statutory offense in the reign of James I. 2 James I, c.11 (1604). This English statute was the prototype for the first North Carolina bigamy statute of 1790. 1790 N.C. Sess. Laws c.11.

Our bigamy statute is presently codified at G.S. 14-183 and reads as follows:

> If any person, being married, shall marry any other person during the life of the former husband or wife, every such offender, and every person counseling, aiding or abetting such offender, shall be guilty of a felony, and shall be imprisoned in the State's prison or county jail for any term not less than four months nor more than ten years. Any such offense may be dealt with, tried, determined and punished in the county where the offender shall be apprehended, or be in custody, as if the offense had been actually committed in that county. If any person, being married, shall contract a marriage with any other person outside of this State, which marriage would be punishable as bigamous if contracted within this State, he shall be guilty of a felony and shall be punished as in cases of bigamy. Nothing contained in this section shall extend to any person marrying a second time, whose husband or wife shall have been continually absent from such person for the space of seven years then last past, and shall not have been known by such person to have been living within that time; nor to any person who at the time of such second marriage shall have been lawfully divorced from the bond of the first marriage; nor to any person whose former marriage shall have been declared void by the sentence of any court of competent jurisdiction.

A person commits bigamy when being lawfully married he purports to marry another person.

The issue raised in the nonsuit question is whether defendant contracted a marriage to Mary Alice Bovender while lawfully married to Sandra Lynch. This case turns upon whether the marriage to Sandra Lynch was a valid marriage under the laws of this State.

The existence of a valid prior marriage must be proved beyond a reasonable doubt by the State. The question of its validity must be determined by the law of the state in which the ceremony was performed. If the prior marriage was void, the second marriage was not bigamous. 2 Wharton's Criminal Law § 236 (14 ed. 1979).

Marriage is an institution controlled by the individual states *Jones v. Bradley,* 590 F.2d 294, 296 (9th Cir. 1979); *see also Boddie v. Connecticut,* 401 U.S. 371, 28 L.Ed.2d 113, 91 S.Ct. 780 (1971). "There are three parties to a marriage contract—the husband, the wife and the State." *Ritchie v. White,* 225 N.C. 450, 453, 35 S.E.2d 414, 415 (1945).

> Marriage, or the relation of husband and wife, is in law complete when parties, able to contract and willing to contract, actually have contracted to be man and wife in the forms and with the solemnities required by law. It is marriage—it is this contract, which gives to each right or power over the body of the other, and renders a consequent cohabitation lawful. And it is the abuse of this formal and solemn contract, by entering into it a second time when a former husband or wife is yet living, which the law forbids because of its outrage upon public decency, its violation of the public economy, as well as its tendency to cheat one into a surrender of the person under the appearance of right. A man takes a wife lawfully when the contract is lawfully made. He takes a wife unlawfully when the contract is unlawfully made; and this unlawful contract the law punishes.

*State v. Patterson,* 24 N.C. 346, 355-56 (1842). To constitute a valid marriage in this State, the requirements of G.S. 51-1 must be met. That statute provides:

> The consent of a male and female person who may lawfully marry, presently to take each other as husband and

State v. Lynch

wife, freely, seriously and plainly expressed by each in the presence of the other, and in the presence of an ordained minister of any religious denomination, minister authorized by his church, or of a magistrate, and the consequent declaration by such minister or officer that such persons are husband and wife, shall be a valid and sufficient marriage: Provided, that the rite of marriage among the Society of Friends, according to a form and custom peculiar to themselves, shall not be interfered with by the provisions of this Chapter: Provided further, that marriages solemnized and witnessed by a local spiritual assembly of the Baha'is, according to the usage of their religious community, shall be valid; provided further, marriages solemnized before March 9, 1909, by ministers of the gospel licensed, but not ordained, are validated from their consummation.

A common law marriage or marriage by consent is not recognized in this State. *State v. Alford*, 298 N.C. 465, 259 S.E.2d 242 (1979); *State v. Samuel*, 19 N.C. 177 (1836). Consent is just one of the essential elements of a marriage. The marriage must be acknowledged in the manner and before some person prescribed in G.S. 51-1. *State v. Wilson*, 121 N.C. 650, 28 S.E. 416 (1897). In order to have a valid marriage in this State, the parties must express their solemn intent to marry in the presence of (1) "an ordained minister of any religious denomination," or (2) a "minister authorized by his church" or (3) a "magistrate."

In this case, the State is required to establish beyond a reasonable doubt that Chester A. Wilson was an ordained minister of a religious denomination or a minister authorized by his church. Though the marriage license is competent evidence tending to prove a marriage, *State v. Melton*, 120 N.C. 591, 26 S.E. 933 (1897), the absence or presence of a marriage license is of minimal consequence in establishing a valid marriage to support a bigamy prosecution. *State v. Robbins*, 28 N.C. 23 (1845); *see also* G.S. 51-6 to -21. The subjective intent of defendant to indeed marry the person alleged to be his first wife is also of minimal consequence. Bigamy is an offense even though unwittingly committed. *State v. Goulden*, 134 N.C. 743, 47 S.E. 450 (1904). The admission of defendant that he was previously married is competent evidence tending to establish the marriage. *State v. Goulden, supra; State v. Melton, supra; State v. Wylde*, 110 N.C. 500, 15 S.E. 5 (1892). The marriage defendant

admitted he entered into or intended and the marriage which is at least licensed by the State or which is apparent by reputation in the community must, however, comply with G.S. 51-1. We conclude the State has failed to meet this burden and the motion for nonsuit consequently should have been allowed.

It is not within the power of the State to declare what is or is not a religious body or who is or is not a religious leader within the body. *State v. Bray*, 35 N.C. 289 (1852). In *Bray*, a bigamy case which brought into question the validity of the first marriage, Chief Justice Ruffin addressed the wording of the North Carolina marriage statute:

> The statute, without assuming to pronounce dogmatically who were true ministers of the gospel, meant to give a catholic rule, by admitting everyone to be so, to this purpose, who, in the view of his own church, hath the cure of souls by the ministry of the Word, and any of the sacraments of God, according to its ecclesiastical polity, implying spiritual authority to receive or deny and desiring to be partakers thereof, and to administer admonition or discipline, as he may deem the same to be the soul's health of the person and the promotion of godliness among the people. When to such a ministry is annexed, according to the canons, or statutes of the particular church, the faculty of performing the office of solemnizing matrimony, the qualification of the minister is sufficient, within the statute.

35 N.C. at 295-96. Whether defendant is married in the eyes of God, of himself or of any ecclesiastical body is not our concern. Our concern is whether the marriage is one the State recognizes. "[A] marriage pretendedly celebrated before a person not authorized would be a nullity." *State v. Wilson*, 121 N.C. 650, 656-57, 28 S.E. 416, 418 (1897). A ceremony solemnized by a Roman Catholic layman in the mail order business who bought for $10.00 a mail order certificate giving him "credentials of minister" in the Universal Life Church, Inc.—whatever that is—is not a ceremony of marriage to be recognized for purposes of a bigamy prosecution in the State of North Carolina. The evidence does not establish—rather, it negates the fact—that Chester A. Wilson was authorized under the laws of this State to perform a marriage ceremony.

The State has failed to prove a prior marriage within the

meaning of G.S. 51-1. The second marriage was therefore not bigamous. Defendant's motion for nonsuit should have been granted. The decision of the Court of Appeals is

Reversed.

Justice BROCK took no part in the consideration or decision of this case.