Sandra LYNCH, Appellee,

v.

UNIVERSAL LIFE CHURCH,
Appellant.

No. 84–1856.

United States Court of Appeals,
Fourth Circuit.

Argued May 7, 1985.

Decided Oct. 23, 1985.

---

Michael K. Curtis, Greensboro, N.C. (Martha E. Johnston, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N.C., on brief), for appellant.

Lawrence J. Fine, Winston-Salem, N.C. (Harrell Powell, Jr., Winston-Salem, N.C., on brief), for appellee.

Before HALL and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

In this diversity case the district court denied a motion filed by Universal Life Church, Inc., for judgment notwithstanding the verdict and entered judgment on a jury verdict finding the church liable for fraud in representing that church ministers could perform valid marriages in North Carolina. The plaintiff, Sandra Lynch, was awarded $10,000 in compensatory damages for emotional anguish she suffered on learning that her marriage was invalid. She also recovered $150,000 in punitive damages. Because we believe that this action was barred by the applicable statute of limitations and also because Mrs. Lynch has failed to prove the elements of fraud, the judgment of the district court must be reversed.

### I

The material facts are undisputed. The church is a corporation organized under the laws of California. It is authorized to conduct business in North Carolina. The church is tax exempt under the laws of California and the United States, and the parties have stipulated that at all times relevant to this case The Universal Life Church was a church.

The Universal Life Church traces its doctrine back to the anticlericalism of the Protestant Reformation and ultimately to the words of St. Paul that the church is a "priesthood of all believers." As an expression of this doctrine, the church ordains ministers without requiring special training or a fee. It ordains by mail and requests a donation with the application for ordination.

In 1972, the plaintiff's father, Chester Wilson, saw an advertisement for the church, which offered to ordain ministers who then could baptize and conduct weddings and funerals. Wilson recently had taken a course in Christianity which "entailed all phases of helping your fellow man." As a result, he believed that he could serve mankind. Because he thought that the respect and authority of a minister's credentials would help him in his work, he answered the advertisement and sent a $10 donation. The church promptly ordained him as a minister by mail. He sought no tax advantage from becoming a minister. The parties stipulated that Wilson believed sincerely that his activities in connection with his ministry were invested with religious significance.

In addition to his ministerial certificate, Wilson received an enclosure stating that he was now qualified to "perform the services any minister is entitled to, i.e. wedding ceremonies, funerals, baptisms, etc." It also contained the following admonition: "Check with your local authorities to see if you need be licensed by the City, County or State. If you encounter any difficulty with any of these authorities please contact [a church official]."

In accordance with this directive, Wilson made inquiries to determine whether a minister of the Universal Life Church could perform legal marriages in North Carolina. Wilson testified without contradiction as follows:

[Mrs. Lynch's counsel]: Did you check about the license?

[Wilson]: The question I asked the County Clerk is could any minister perform a marriage in the State of North Carolina. And they said yes.

[Counsel]: And what, if any, other indication did you have that as a Universal Life Church minister you would not be allowed to perform a marriage?

[Wilson]: I had no indication whatsoever.[1]

Wilson's daughter, Sandra, lived with James Lynch although both of them were

---

**1.** Wilson was not the only minister of the Universal Life Church who asked state officials about his authority to perform weddings. A former United States magistrate was ordained as a minister in the Universal Life Church in the early 1970's, and, after checking with North Carolina officials, he, too, performed weddings in the state. *See also Fulton v. Vickery,* 73 N.C.App. 382, 326 S.E.2d 354 (1985) (Vickery, an attorney and minister of Universal Life Church, performed wedding ceremony.)

married to other persons. After Sandra obtained a divorce, she and Lynch planned to marry before Lynch's divorce became final. Wilson convinced the couple that they should not carry out their plans and that they should wait until Lynch was divorced. In return for their agreement to wait, Wilson agreed to marry them when Lynch's divorce became final. In due time, Sandra and James obtained a marriage license and blood tests. Wilson married them on October 28, 1973. In 1977, they separated.

In April, 1978, Sandra received a letter from James Lynch's lawyer asking her cooperation in obtaining a Dominican divorce. She refused. Sandra also spoke to James by phone. During one of these conversations in June or July, 1978, James told her that his attorney had advised him that their marriage was invalid. Sandra testified that James did not explain the reasons for his lawyer's opinion and that she did not believe James.

Soon after this conversation, and without obtaining a divorce, James Lynch married his girlfriend. When Sandra found out about this marriage in July, 1978, she brought it to the attention of state officials. Lynch was prosecuted for bigamy and convicted. In 1980, the North Carolina Supreme Court reversed on the ground that the state had failed to prove that the marriage between Sandra and James Lynch was valid under the laws of North Carolina. *State v. Lynch*, 301 N.C. 479, 272 S.E.2d 349 (1980). The Court held that Wilson was not authorized under North Carolina law to perform a marriage ceremony.[2] In January, 1981, James Lynch obtained an annulment of his marriage to Sandra. This action was filed in August, 1981.

## II

The North Carolina statute of limitations for fraud is three years, and "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud ..." N.C.Gen.Stat. 1–52(9). The statute has been construed to provide that an action for fraud accrues and limitations begin running "when the aggrieved party discovers the facts constituting the fraud, or when, in the exercise of reasonable diligence, such facts should have been discovered." *Vail v. Vail*, 233 N.C. 109, 116, 63 S.E.2d 202, 207 (1951).

This action was commenced in August, 1981. Thus, if Mrs. Lynch knew, or in the exercise of reasonable diligence should have known, of the facts constituting the alleged fraud before August, 1978, the statute of limitations would bar her action. The district court submitted this issue to the jury, which returned a verdict for Mrs. Lynch.

The parties entered into the following stipulation concerning the facts Mrs. Lynch knew at the time of her marriage:

As Mrs. Lynch knew at the time of the marriage, Mr. Wilson had been ordained as a minister of the Universal Life Church. He had been ordained by writing a request for ordination and he was ordained on January 7, 1973.

\*   \*   \*   \*   \*   \*

Sandra Lynch knew that her father had no formal ministerial training, had no congregation of his own, and how he obtained his ministerial credentials. All of these facts were fully known to Mrs. Lynch prior to the time of her marriage to James Robert Lynch.

\*   \*   \*   \*   \*   \*

Sandra Lynch knew that her father had written off to the Universal Life Church and had been ordained by mail and had not been required to undergo

---

**2.** N.C.Gen.Stat. 51–1 provides in part:

The consent of a male and female person who may lawfully marry, presently to take each other as husband and wife, freely, seriously and plainly expressed by each in the presence of the other, and in the presence of

an ordained minister of any religious denomination [or] minister authorized by his church ... and the consequent declaration by such minister ... that such persons are husband and wife, shall be a valid and sufficient marriage ...

any course of study prior to being ordained.

Thus, Mrs. Lynch at the time of her marriage knew the facts about the ordination of her father that formed a basis of the North Carolina Supreme Court's decision that he was not authorized to perform a marriage ceremony.[3]

Furthermore, Mrs. Lynch testified that in June or July, 1978, her husband told her that he was going to get married to his girlfriend "because our marriage is not legal anyway." She also testified that her husband told her that his lawyer had told him that "our marriage wasn't any good." She added that she did not believe her husband. Any doubts about her husband's intentions soon were dispelled. She testified that in July, 1978, she learned that her husband had married his girlfriend.

Thus, prior to August, 1978, Mrs. Lynch knew all the facts about her father's ordination. She knew her husband had said their marriage was invalid and that he had remarried. In short, she knew that she had been harmed, and she knew all the facts that caused the harm.

We cannot accept Mrs. Lynch's argument that her cause of action accrued when she learned her marriage was invalid after the decision of *State v. Lynch* in 1980. This argument overlooks the distinction drawn in North Carolina between knowledge of facts that constitute fraud and knowledge of the law governing fraud. The law of North Carolina on this point is stated in *Hiatt v. Burlington Industries, Inc.*, 55 N.C.App. 523, 529–30, 286 S.E.2d 566, 570, *review denied* 305 N.C. 395, 290 S.E.2d 365 (1982):

> Plaintiff attempts to prolong the statute of limitations by arguing that his knowledge of the facts of the alleged fraud was not complete until 1980 when he read an article about the law of pat-

ents. We reject this argument. Knowledge of the *law* governing alleged fraud is not included in the G.S. 1–52(9) requirement of knowledge of the *facts* constituting the alleged fraud. (emphasis in original)

The significance of knowledge of the facts constituting the alleged fraud is emphasized in *Vail v. Vail*, 233 N.C. at 116, 63 S.E.2d at 207 (1951), where the court said: "[I]t is the accepted rule that 'Knowledge by the defrauded person of facts which in the exercise of proper diligence would enable him to learn of the fraud ordinarily is equivalent to discovery of the fraud.' "

■ There is no question about what facts Mrs. Lynch knew about the alleged fraud, for they are derived from a stipulation and her testimony. When the facts are admitted or established, the plea of limitations should be decided as a matter of law. *Little v. Rose*, 285 N.C. 724, 727, 208 S.E.2d 666, 668 (1974).

These general principles of North Carolina law were applied in a case involving a charge of fraud against the Universal Life Church, which the North Carolina Court of Appeals decided after the trial of Mrs. Lynch's action. In *Fulton v. Vickery*, 73 N.C.App. 382, 326 S.E.2d 354, *review denied* 313 N.C. 599, 332 S.E.2d 178 (1985), the court affirmed a grant of summary judgment in favor of the church. As in the case before us, a woman sued the church for fraud because her marriage by a minister who had been ordained by the church was allegedly invalid. As an alternative ground for dismissal, the church argued that the action, filed in 1983, was barred because any injury was discoverable at the time of the marriage in 1972. The court agreed. It stated: "In a case of fraud, the statute runs from the discovery of the fraud or from when it should have been

---

**3.** In *State v. Lynch*, 301 N.C. at 488, 272 S.E.2d at 354–55, the court said:

A ceremony solemnized by a Roman Catholic layman in the mail order business who bought for $10.00 a mail order certificate giving him "credentials of minister" in the Universal Life Church, Inc.—whatever that is—is

not a ceremony of marriage to be recognized for purposes of a bigamy prosecution in the State of North Carolina. The evidence does not establish—rather, it negates the fact—that Chester A. Wilson was authorized under the laws of this State to perform a marriage ceremony.

discovered by the exercise of reasonable care." 73 N.C.App. at 390, 326 S.E.2d at 359. Applying this rule, the court held that the statute of limitations started to run at the time of the plaintiff's marriage. Consequently, the three-year period of limitation provided in N.C.Gen.Stat. 1–52(9) (fraud) barred the action.

■ The North Carolina Court of Appeals is a court of statewide jurisdiction, and its decisions are binding on state trial courts in the absence of a conflicting decision by the North Carolina Supreme Court. Ordinarily, a federal court should follow the decisions of the intermediate state court of appeals. *West v. American Telephone and Telegraph Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). In the present case, there is no sound reason for departing from this practice. In *Fulton v. Vickery*, the bar of the statute was imposed because the facts constituting the fraud were discoverable in the exercise of reasonable care. Here, the facts were not only discoverable, Mrs. Lynch knew them. Because Mrs. Lynch knew the facts constituting the alleged fraud prior to August, 1978, and brought this action in August, 1981, the action is barred by North Carolina's statute of limitations.

### III

As a second reason for reversal, we conclude that Mrs. Lynch failed to prove all of the elements required by North Carolina law for a cause of action for fraud. Consequently, the court should have granted the church's motion for judgment notwithstanding the verdict. Decision of the motion depends on whether there is evidence on which the jury could properly base a verdict. *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 167 (4th Cir.1957). The rule governing decision has been stated in these terms:

> In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence.

9 Wright & Miller, *Federal Practice and Procedure* § 2524 at 543–45 (1971); *accord Abasiekong v. City of Shelby*, 744 F.2d 1055, 1059 (4th Cir.1984).

In this case, the material facts are uncontradicted. Credibility of the witnesses is not an issue. The flaw in Mrs. Lynch's case is apparent from the evidence she introduced. There is no need to weigh this evidence against the church's or even to consider the church's evidence.

■ Under North Carolina law, the plaintiff who alleges fraud must prove that the defendant has materially misrepresented a definite past or existing fact, knowing the representation to be false or in culpable ignorance of its truth, and intending that it should be acted upon; and further that the recipient of the misrepresentation reasonably relied and acted upon it and suffered injury thereby. *Rosenthal v. Perkins*, 42 N.C.App. 449, 451–52, 257 S.E.2d 63, 65 (1979).

■ Mrs. Lynch testified that she knew her father could perform her wedding ceremony because he told her he could and that she also knew this from his certificate. On cross-examination, she admitted that the only certificate she saw was his ministerial certificate. This certificate had been introduced as plaintiff's exhibit 1. It contains no reference to performing marriage ceremonies. Mrs. Lynch does not claim that she saw the church's advertisement or that she had any direct contact with the church. Mrs. Lynch makes no claim that her father defrauded her. Indeed, she could not, for she has stipulated that he "sincerely and honestly believed he was acting as a minister" and that "in connection with his ministry he was doing things of religious significance."

Thus, Mrs. Lynch's theory of the case depends on representations the church made to her father on which he relied. In the advertisement to which he responded,

the church represented that it could ordain him and that as a minister he could perform weddings. He relied on this advertisement to the extent of requesting ordination and sending $10. Mrs. Lynch proved that at that time the church knew that Ohio and New York courts had held that marriages performed by its ministers in those states were invalid. She introduced no evidence that the church knew that marriages performed by its ministers in North Carolina were invalid.

The church sent Wilson a certificate of ordination and information about the church. The enclosure (Plaintiff's exhibit 2) reiterated that he could perform wedding ceremonies, funerals, and baptisms. But significantly, as we pointed out in Part I, it contained a statement that he should check with his local authorities to see if he needed to be licensed. He followed the church's directions and checked at the county clerk's office to ascertain whether he could perform weddings. He learned that he could, and it was after he received this information from the clerk's office that he conducted his daughter's wedding.

The church unequivocally represented that Wilson's ordination qualified him to conduct a religious ceremony of marriage. But the religious aspect of the church's representation is not an issue, and the district court quite properly did not allow it to become one. The Supreme Court of North Carolina has declared that whether one is married in the eyes of an ecclesiastical body is of no concern to the judiciary. The Court has long recognized: "It is not within the power of the State to declare what is or is not a religious body or who is or is not a religious leader within the body." *State v. Lynch*, 301 N.C. at 488, 272 S.E.2d at 354.

The church made no unequivocal representation that Wilson was qualified under the laws of North Carolina to perform a wedding ceremony. On the contrary, with respect to his secular qualifications, it directed him to check with local authorities. This undisputed evidence, which was dis-closed by Mrs. Lynch conclusively establishes the following facts:

¶ The church made no representation that ordination unequivocally authorized Wilson to perform weddings that would be valid under state law.

¶ The church made no misrepresentation about Wilson's secular authority with knowledge of its falsity or in culpable ignorance of its truth. On the contrary, the church admonished Wilson to check with secular authorities to ascertain the secular requirements of licensure.

¶ The church did not intend Wilson to act on the representation that his ordination qualified him under state law to perform marriages. Instead, the church directed him to consult state authorities for information about the need of a license to perform wedding ceremonies.

¶ Wilson did not rely on any representation made by the church concerning his secular authority. Instead, as directed by the church, he checked with a local official. Only after being assured that he could act did he deem himself qualified under state law to perform weddings.

The church cannot be faulted because the advice given by the local official ultimately turned out to be incorrect. There is no proof that the church knew that this advice was incorrect at the time Wilson performed the ceremony for his daughter's wedding. Wilson, whose honesty and sincerity about his religious calling were stipulated, cannot be faulted for following the advice. In *Fulton v. Vickery*, 73 N.C.App. at 389, 326 S.E.2d at 359, the court observed that given the unsettled state of North Carolina law until the decision of *State v. Lynch* in 1980, it was not unreasonable for a lawyer, who had been ordained as a minister in the Universal Life Church, to conclude that he could perform legal marriages in the state.

Mrs. Lynch's evidence disclosed that she did not prove the essential elements of actionable fraud set forth in *Rosenthal v. Perkins*, 42 N.C.App. at 452–53, 257 S.E.2d

at 65. The defects of her proof were not mended by the church when it introduced its evidence. The church was entitled to a judgment notwithstanding the verdict. Consequently, the judgment of the district court is reversed, and the case is remanded for entry of judgment in favor of the church.