GRIFFIN, Justice,
dissenting:
I respectfully dissent. The majority holds that Claude Clark, an active Methodist layman and Hinds County Constable, is a “spiritual leader” of a “religious body” within the meaning of our marriage statutes. The record reflects that Clark received a blank Certificate of Ministry from the Universal Life Church of Modesto, California; he inserted his name in the certificate; and thereafter considered himself a minister of the gospel, not merely a spiritual leader of a religious body.
He was asked the following question:
Q. Now, during the time after you received your certificate of ministry, of course you consider yourself a minister of the gospel, ordained under rules of this church?
His reply:
A. Yes sir.
The ordination service was without form or substance. It consisted merely of writing for the certificate and filling in the blank. He was then asked the following question:
Q. And at that time, that you performed the ceremony, you of course represented yourself to be a minister of the gospel.
A. Yes sir.
The learned chancellor, in my opinion, properly responded to this evidence. Leaving off some opening and closing personal remarks concerning the attorneys, I quote his opinion extensio:
The only issue to be resolved is whether or not Mr. Blackwell and Mrs. Nadine Fortenberry Blackwell were properly married on November 10, 1984, some three months before his death on February 7, 1985.
The courts of this state have long recognized and followed the rule that marriages are to be favored and they will indulge all reasonable presumptions to that end. Therefore, this marriage should be upheld if proper under the law and evidence.
The court has found the discussion of church and religious organizations interesting; however, this case involves not a test of religious belief, but rather the *1198 qualifications to perform marriages under the statute.
There is no question that Cobert Blackwell and Nadine Fortenberry Blackwell thought that they were married. They went to Jackson for that purpose, and after some difficulty arranged for the ceremony. It was conducted by Mr. Claude Clark, a minister of the Universal Life Church, Inc. Thereafter they began their married life together, and held themselves out in the community as man and wife; unfortunately, Mr. Blackwell died soon thereafter.
If Mrs. Blackwell is the widow of Mr. Blackwell, she is entitled to a portion of his estate; if she is not his widow, she is not entitled to any portion.
The legal issue raised by plaintiffs is whether or not Claude Clark, as a “Minister” of the “Universal Life Church, Inc.,” is a person authorized under the provisions of Section 93-1-17, Mississippi Code of 1972, to conduct a marriage ceremony?
That section provides in part the following:
“Any minister of the gospel ordained according to the rules of his church or society, in good standing; .... or other spiritual leader of any other religious body authorized under the rules of such religious body to solemnize rites of matrimony and being in good standing; . may solemnize the rites of matrimony between any persons anywhere within this state who shall produce a license granted as herein directed.”
The issue is not whether first, they thought they were married, and held themselves out as man and wife. Nor is the issue, secondly, whether the court agrees with the beliefs, teachings or doctrines of the Universal Life Church, Inc. While the first is important and necessary, and the second can have no influence on this decision, the only issue here is the qualification of the one conducting the ceremony.
What kind of minister is Mr. Clark? Some short while before he conducted the service in question, the Justice Court Judges of Hinds County had determined they would no longer conduct marriage ceremonies outside of the office. Mr. Clark, a constable in that county, seeing a need for someone to conduct these services investigated as to how he might become qualified to do so. He wrote to the Universal Life Church, Inc. of Modesto, California to inquire of its requirements to become a minister. Shortly thereafter, He received by mail credentials on a form with the name left blank. All that was necessary was for him to insert his name, and he was in business. The record reflects that His sole purpose was to become authorized to conduct marriage ceremonies, and nothing in his conduct or activity indicates any intent on his part to be a minister. Someone connected with the church or corporation sent the credentials to him, solely upon the inquiry made. He was a Methodist by religion, active in his church prior to and after receiving his certificate.
In this manner he became a minister. Of What did he become a minister? The Universal Life Church, Inc. of Modesto, California, has no church congregation or building or meeting place for worship or any form of religious observance, presided over or directed by some person, whether or not properly ordained. There is no traditional doctrine except each person is free to decide for himself or herself what is right. The church will ordain anyone without question of faith, doctrine or creed simply upon request, and perhaps a love offering. Each person added to the ranks has a choice of title available, and if “minister” does not satisfy, they may select “king” or any other designation. From the exhibits made a part of the record, and the testimony, this church is unusual, distinctive and controversial, to say the very least. The court recognizes however, that this is not the issue. It must put aside personal feelings and traditional views, and not consider the merits or demerits of this or any other group insofar as religious beliefs are concerned.
*1199 The members of any religion may hold such beliefs as they choose, and the state has no interest therein. But the state does have an interest in who may solemnize the rites of matrimony; and the state has provided by statute those authorized to perform this special and important function.
The question again is whether Mr. Clark, as a minister of the Universal Life Church, Inc., is authorized, under Section 93-1-17, Mississippi Code of 1972 this function?
Three cases from other jurisdictions have been cited as dealing with marriages performed by ministers of this church. They are Cramer v. Commonwealth, [214 Va. 561] 202 S.E.2d 911 (Va.1974), Ravenall [Ravenal] v. Ravenall [Ravenal], 72 Misc.2d 100, 338 N.Y. S.2d 324 (1972) and State v. Lynch, [301 N.C. 479] 272 S.E.2d 349 (N.C.1980). It is argued that while these decisions attack the Universal Life Church, they do not undermine the validity of marriages performed to the detriment of a marriage partner who relied in good faith on the authority of the minister. However, the court is of the opinion and so finds that these cases are on point, well reasoned and concurs with the findings therein.
The court is mindful of the situation of respondent and concerned, but even so, it cannot, in equity and good conscience, hold that under the record here, Mr. Clark is qualified or authorized by law to perform the marriage ceremony. The court, after mature and deliberate consideration, is of the opinion that Mr. Clark does not fit within the requirements of Section 93-1-17, Mississippi Code. He is not a minister of the gospel as contemplated by the statute, nor is he a spiritual leader of a religious body.
In view of the finding of the court that the ceremony was not performed by an individual authorized by the law of this state, the parties were not legally married, and she is not his widow.
I believe the chancellor’s opinion to be eminently correct and we should not disturb it. Clark made no contention that he was a religious leader and well he could not because, as the record reflects, he had no congregation nor made any effort to form such an assembly. Using his own analysis he received a certificate of a minister in order to fill , in for the justice court judges who were at the time only performing weddings during office hours. He makes no contention that he had any authorization from the Methodist Church, his denomination, and well could not have if he truly believed in the ministry of the Rev. Hensley, the founder of the Universal Life Church, who, according to an exhibit in the record, preached “we will come to know that Jesus is the manifestation of the devil working in man today;” and which sermon continues with the statement that there is no supernatural and that God is substance and everything.
As the North Carolina Supreme Court stated, “a marriage pretendedly celebrated before a person not authorized would be a nullity. A ceremony solemnized by a Roman Catholic layman in the mail order business who bought for $10 a certificate giving him the ‘credentials of ministry’ in the Universal Life Church, Inc. — whatever that is — is not a ceremony of marriage to be recognized for the purpose of bigamy prosecution.” State v. Lynch, 301 N.C. 479, 272 S.E.2d 349.
Section 93-1-17, Mississippi Code Annotated (Supp.1987), copied in the chancellor’s opinion, tells us who may solemnize marriages, while Section 93-1-15 leaves no doubt concerning the legislative intent that marriages be performed by one authorized to perform marriages. It reads as follows:
(1) No marriage contracted after April 5, 1956 shall be valid unless the contracting parties shall have obtained a marriage license as otherwise required by law, and unless also the marriage, after such license shall have been duly issued therefor, shall have been performed by or before any person, religious society, institution, or organization authorized by sections 93-1-17 and 93-1-19 to solemnize marriages. Failure in any case to comply with both prerequisites aforesaid, which shall also be construed as mandatory and not merely directory, *1200 shall render the purported marriage absolutely void and any children bom as a result thereof illegitimate.
(2) Nothing contained in this section shall be construed to affect the validity of any marriage, either ceremonial or common law, contracted prior to April 5, 1956.
This act abolishes common law marriages.
The most casual observer would quickly note that Clark claims to be a minister within a group in whose beliefs he does not subscribe, observing further that his own denomination has not authorized performance of marriage ceremonies by him.
The majority opinion offers a distinction between this case and the Virginia, North Carolina and New York cases relied upon by the chancellor. Admittedly they were before the courts of those states in a different posture. In North Carolina we have a prosecution for bigamy and the Supreme Court of that state held that a marriage performed by one licensed by the Universal Life Church in the exact same manner as Clark would not sustain a conviction for bigamy. State v. Lynch, supra. Both New York and Virginia held that “ministers” of the Universal Life Church did not qualify under the licensing statutes of those states as ministers or religious leaders approved to perform marriages. That, as here, was the sole question before the New York and Virginia courts. The New York decisions come from a trial court in that state, not the highest court, and in Ravenal v. Ravenal, supra, it was held that a marriage performed by a guitarist/folk singer/minister of the Universal Life Church was invalid. The judge there held that the “minister” was neither a clergyman nor a minister and the Universal Life Church was not an ecclesiastical body of a denomination or order within the meaning of the state statute. In Rubino v. City of New York, 125 Misc.2d 936, 480 N.Y.S.2d 971 (1984) (the licensing case), another judge cited Ravenal and affirmed the refusal of the clerk of the City of New York to register Universal Life Church members to perform marriages.
As stated, we agree that our statutes are somewhat different from those of the three states mentioned; however, the decisions there go to the same basic questions regardless of the statutory verbiage, i.e., whether or not these “ministers” of the Universal Life Church are in fact ministers or religious leaders. In Cramer v. Commonwealth, supra, the Supreme Court of Virginia addressed the legislative intent on the questions there, and among other things, said:
... obviously [the legislature] meant to qualify those individuals who, in accordance with the rules, regulations and discipline of their church, religious sect or organization, had been selected or elected as ministers.... The General Assembly assumes that the head of an ecclesiastical order will be a responsible person and will, in turn, act responsibly in the selection of a minister ... (and) that a congregation, the body corporate, will act responsibly and select a proper person as a minister_ (202 S.E.2d 914) ... The statute amounts to a blanket qualification of all ministers selected or elected by religious organizations and societies. But such a selection or election must be a considered, deliberate and responsible act. It must be an authoritative act. Ordination is the ultimate in the selection process_ (202 S.E.2d 915)
It is apparent that we have here an organization of ministers — over one million in number says Universal — over one and one-half million says Jeffery Eugene Kelseo, one of appellant's witnesses and a Universal minister. It appears that Universal encourages all who subscribe to its one tenet to become ministers. A church which consists of all ministers, and in which all new converts can become instant ministers, in fact has no ‘'minister” within the contemplation of code section 20-23. The minister referred to there is the head of a religious congregation, society or order. He is set apart as the leader. He is the person elected or selected in accordance with the .ritual, by-laws or discipline of the order. By contrast, in Universal every living *1201 person is not only eligible for membership, but eligible for immediate ordination into the ministry, with all the benefits of that profession. We do not believe that the General Assembly ever intended to qualify, for licensing to marry, a minister whose title and status could be so casually and cavalierly acquired. (Emphasis supplied) (202 S.E.2d 915).[1]
All of us who have a speaking acquaintance with the religious activities within our state well know that there are certain groups or denominations who call all of their members ministers; for example, Jehovah’s Witnesses. However, none of these groups make any contention that every member of their congregation is authorized to perform marriages, but leave this function to one selected according to their own rules and customs. Certainly, then, the term spiritual leader of a religious body referred to in the statute has more meaning than the lowest form of membership.
Both the appellant and the appellee agree that the licensing and performing of marriage are traditional matters of state law and that no question concerning First Amendment rights is involved. Maynard v. Hill, 125 U.S. 190, 8 S.Ct. 723, 31 L.Ed. 654 (1888); Butler v. Wilson, 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974), and numerous other cases, both state and federal.
We are not here inquiring into the validity of any religious doctrine or belief but simply interpreting our state statute, the constitutionality of which is not in question. Therefore, even though we may have sympathy for the appellant, that sympathy need not deter us from doing our duty in carrying out the intent of our state legislature.
It will be argued, I am sure, that we are acting detrimentally to innocent people who, in good faith had one of these alleged ministers to marry them. In reply we point out that by § 93-1-15, supra, both the license and the solemnization are required for a valid marriage.
Common law marriages became invalid after April 5,1956. All of those desiring to enter into a marriage contract are required to appear before the circuit clerk, obtain a blood test and go through a three-day waiting period before a license may be issued. This procedure is no formality. The law must be complied with and on this we hear no complaints because it effectively eliminated marriage mills from within our borders. We all accept this procedure. Why, then, should it be such a burden for the marrying partners to make some inquiry concerning the credentials of one offering to perform the solemn ceremony. This would take less effort than the obtaining of the license.
Certainly we have some feeling for Mrs. Blackwell, but to allow that feeling to overcome reality would in effect permit every self-appointed minister or those appointed in a dubious fashion as here to perform marriages and completely defeat the purpose of § 93-1-15, supra. In order to enforce the law on occasions someone gets hurt, but it is our duty to see that the practice divulged here is stopped and the law complied with.
If the legislature considers our action harsh, it may as the North Carolina legislature did, validate these marriages up to a certain date provided they are not already invalidated by a court order. North Carolina did not amend its statute, they simply validated the marriages. Those couples *1202 feeling aggrieved by our opinion may, while both are still living, remarry.
I would affirm.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., join this opinion.

. According to the record, Universal Life Church has fourteen million ministers. This is the lowest rank in the church. It offers seven different doctoral degrees in return for cash from $10 to $100 and the completion of a short test and will confer for $5 donations fifty other special titles including bishop, friar, rabbi, prophet, swami and ascetic gnostic and, I suppose for the more worthy, a sainthood certificate may be obtained for $5. Most attractive is advice on how to fight the Internal Revenue Service.
Further, the secretary for appellee’s attorney wrote to Universal Life Church for a minister’s certificate. She not only received hers but a supply. Following the power given her by the Universal Life Church, she inserted the names of her two dogs. Are these dogs now "close enough” to being spiritual leaders of a religious body to qualify to perform marriages?