7 A.3d 13

**WAL MART STORES, INC., et al.**

v.

**Larry HOLMES, Sr., et ux.**

**No. 141, Sept. Term, 2009.**

Court of Appeals of Maryland.

Oct. 25, 2010.

Richard W. Scheiner (Mary M. Wiethorn and Julie M. Dietrick of Semmes, Bowen & Semmes, Baltimore, MD), on brief, for petitioners.

Jeff E. Messing, Baltimore, MD, for respondents.

GREENE, J.

Larry Holmes, Sr., ("Mr. Holmes") Respondent in this case, seeks to collect permanent partial disability benefits under the Maryland Workers' Compensation Act, Md.Code (1991, 2008 Repl.Vol.) §§ 9–101–9–1201 of the Labor and Employment Article (the "Act")[1] that would have been due to his wife, Patricia L. Holmes ("Mrs. Holmes"), had she not died of causes unrelated to the injuries she sustained in the course of her employment with Wal Mart Stores, Inc., Petitioner ("Wal Mart"). Mr. Holmes relies upon § 9–632(d) of the Act, which provides for the survival of benefits to a non-dependent spouse where the deceased worker had "a legal obligation to support" the surviving spouse on the date of death. Respondent contends that "a legal obligation to support" a surviving spouse is inherent in the marital relationship and continues until given up, either voluntarily or by court order. We disagree with Respondent's position, and hold that for purposes of § 9–632(d) "a legal obligation to support" a surviving spouse does not arise by virtue of the marital tie alone and, for that reason, we shall reverse the judgment of the Court of Special Appeals in *Holmes v. Wal Mart*, 187 Md.App. 690, 979 A.2d 744 (2009) and remand to that court with directions to affirm the judgment of the Circuit Court for Baltimore City.

## FACTS AND PROCEDURAL HISTORY

 Mr. and Mrs. Holmes were married in 1969. They were not living together at the time of Mrs. Holmes's compensable injury, which occurred on November 3, 1999 in the course of her employment with Wal Mart. The Workers' Compensation Commission ("Commission") awarded Mrs. Holmes temporary total disability benefits following her timely claim.[2] Mr. and Mrs. Holmes reunited in 2003 and were

---

**1.** All statutory references herein are to the Maryland Workers' Compensation Act, Md.Code (1991, 2008 Repl.Vol.) §§ 9–101–9–1201 of the Labor & Employment Article, except where noted otherwise.

**2.** The four categories of disability benefits to which an injured worker may be entitled are: temporary partial disability (disability which is

living as husband and wife for approximately three years until her death on December 4, 2006.[3]

Mrs. Holmes received compensation for her injury until November 28, 2006, when she was found to have reached maximum medical improvement from her injuries.[4] At that time, Mrs. Holmes could have applied to the Commission for an award of either permanent partial or permanent total disability benefits. Unfortunately, on December 4, 2006, Mrs. Holmes died of causes unrelated to her work-related injuries before she could seek such benefits. On May 7, 2007, Mrs. Holmes's attorney filed post-mortem issues with the Commission seeking permanent disability benefits and alleging that the right to collect those benefits should pass to Larry Holmes, Sr., as Mrs. Holmes's surviving spouse.

The Commission held a hearing on September 19, 2007 to consider whether Mrs. Holmes's unexercised right to collect permanent benefits would inure to the benefit of Mr. Holmes. At that hearing, the Commission determined that Mr. Holmes was not a dependent[5] of Mrs. Holmes and that Mrs. Holmes

---

temporary in duration and partial in extent) under §§ 9-614—9-617; temporary total disability (disability which is temporary in duration but total in extent) under §§ 9-618—9-624; permanent partial disability (disability which is permanent in duration and partial in extent) under §§ 9-625—9-634; and permanent total disability (disability which is permanent in duration and total in extent) under §§ 9-635—9-642.

3. During those three years, Respondent and Mrs. Holmes combined his income, approximately $1,100 monthly, with her workers' compensation benefits, approximately $1,300 monthly, to meet their living expenses.

4. The "period of temporary total disability is the healing period or the time during which the work[er] is wholly disabled and unable by reason of his [or her] injury to work. It is, therefore, a separate and unitary period of compensation, and as such is distinguished from a permanent partial disability." *Jackson v. Beth.-Fair. Shipyard,* 185 Md. 335, 339, 44 A.2d 811, 812 (1945) (quoting *Gorman v. Atlantic Gulf & Pacific Co.,* 178 Md. 71, 78, 12 A.2d 525, 529 (1940)).

5. Specifically, the Commission found that no dependency existed because "at the time of the accidental injury, the claimant and her spouse were living separate and apart." Dependency is determined at the time

had no surviving minor children. Consequently, Mr. Holmes ability to pursue his wife's claim is controlled by § 9–632(d) of the Act:

### § 9–632. Survival of compensation.

(a) *Scope of section.*—This section does not apply to compensation paid under Title 10, Subtitle 2 of this article.

(b) *In general.*—If a covered employee dies from a cause that is not compensable under this title, the right to compensation that is payable under this Part IV of this subtitle and unpaid on the date of death survives in accordance with this section.

(c) *Surviving dependents.*—If there are surviving dependents of the covered employee, the right to compensation survives to the surviving dependents as the Commission may determine.

(d) *No surviving dependents; obligation to support surviving spouse.*—If there are no surviving dependents of the covered employee and, on the date of death, the covered employee had *a legal obligation to support a surviving spouse*, the right to compensation survives jointly to:

(1) the surviving spouse of the covered employee; and

(2) the surviving minor children of the covered employee.

(e) *No surviving dependents or obligation to support surviving spouse.*—If there are no surviving dependents and, on the date of death, the covered employee did not have a legal obligation to support a surviving spouse, the right to

---

of the injury rather than at the time of death. § 9–679(1); *see Meadowood v. Keller,* 353 Md. 171, 187, 725 A.2d 563, 571 (1999) (stating "dependency for purposes of § 9–632 is to be determined in accordance with the circumstances existing at the time of the accident."). When Mrs. Holmes was injured in 1999, she was still separated from Mr. Holmes. Mr. Holmes was employed and was not receiving any payments from Mrs. Holmes. Mr. Holmes did not rely on Mrs. Holmes for the necessities of life at the time of the accident. The Commission concluded, and the parties do not contest, that Mr. Holmes was not dependent on Mrs. Holmes for purposes of § 9–632(c) and therefore Mr. Holmes had no right to benefits under the Act based on dependent status.

compensation survives only to the surviving minor children of the covered employee.

(Emphasis added.).

On October 3, 2007, the Commission found that Mr. Holmes had presented insufficient evidence to show that Mrs. Holmes had "a legal obligation to support" him at the time of her death and therefore, any right to claim her permanent partial benefits did not pass to him. The Commission heard and considered substantially similar arguments presented in Mr. Holmes's reply brief in this Court, particularly that "a legal obligation to support" arises as a result of the marital bond, exists until given up by either spouse, and exists by implication from Md.Code (1991, 2006.Repl.Vol.), § 10–201 of the Family Law Article, which imposes criminal penalties for willful non-support of a spouse.

Subsequent to the Commission's determination that Mr. Holmes was ineligible to claim benefits under § 9–632(d), Mr. Holmes filed a Petition for Judicial Review in the Circuit Court for Baltimore City. On February 29, 2008, the Circuit Court granted Wal Mart's motion for summary judgment and affirmed the Order of the Commission.

Mr. Holmes then filed a timely appeal to the Court of Special Appeals. On September 2, 2009, following oral arguments, the Court of Special Appeals issued its opinion reversing the judgment of the Circuit Court for Baltimore City. *Holmes v. Wal Mart Stores, Inc.*, 187 Md.App. 690, 979 A.2d 744 (2009). The Court of Special Appeals held that benefits survive to the spouse "unless the spouse has agreed to or has been adjudicated to have given up his or her right of support." *Holmes,* 187 Md.App. at 714, 979 A.2d at 748.

On December 9, 2009, we granted *certiorari, Walmart v. Holmes,* 411 Md. 599, 984 A.2d 244 (2009), to answer the following question posed by Wal Mart, which we have reworded slightly for clarity:

Did the Court of Special Appeals err when, in a case of first impression, it held that for the purposes of § 9–632 of the Labor and Employment Article of the Annotated Code of

Maryland a spouse has a legal obligation to support his or her surviving spouse solely by virtue of the marital tie and in the absence of a court order, decree, or other adjudication establishing a legal obligation to pay support?

## STANDARD OF REVIEW

█ Section 9–745(b) of the Labor and Employment Article, provides that the decisions of the Commission are presumptively correct. This presumption, however, does not extend to questions of law. *See Beyer v. Decker,* 159 Md. 289, 291, 150 A. 804, 805 (1930) (stating "when the facts are undisputed, as here, the only remaining question, that of the effect of the act on such a state of facts, is one of statutory construction, and one of law for the court; and no presumption could control the conclusion as to the meaning of the statute.") (citations omitted).

In *Baltimore v. Kelly,* we considered the appropriate standard of review on appeal from a grant of summary judgment by a Circuit Court engaged in judicial review of a decision by the State Workers' Compensation Commission:

The general standards for determining whether summary judgment is appropriate are well established. Under Maryland Rule 2–501(a), "any party may file at any time a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." While summary judgment motions exist to facilitate the efficient disposition of litigation, where appropriate, we have recognized that "the function of a summary judgment proceeding is not to try the case or to attempt to resolve factual issues, but to ascertain whether there is a dispute as to a material fact sufficient to provide an issue to be tried." *Peck v. Baltimore County,* 286 Md. 368, 381, 410 A.2d 7, 13 (1979) (citing *Honaker v. W.C. & A.N. Miller Development Company,* 285 Md. 216, 231, 401 A.2d 1013, 1020 (1979)). Thus, "in a summary judgment proceeding even where the underlying facts are undisputed, if those

facts are susceptible of more than one permissible inference, the choice between those inferences should not be made as a matter of law, but should be submitted to the trier of fact." *Fenwick Motor Company, Inc. v. Fenwick,* 258 Md. 134, 138, 265 A.2d 256, 258 (1970) (Citations omitted.).

\* \* \*

■ [W]e necessarily consider the complication of § 9–745 of the Labor and Employment Article of the Maryland Code (1991, 1999 Repl.Vol.), which provides the procedure for the conduct of proceedings in a circuit court for "appeals" from decisions from the Workers' Compensation Commission. Specifically, § 9–745(c) states that "the court shall determine whether the Commission: (1) justly considered all of the facts . . . ; (2) exceeded the powers granted to it under this title; or (3) misconstrued the law and facts applicable in the case decided." Section 9–745(e) provides that, upon its review of the Commission's decision, the Circuit Court may either confirm, reverse, or modify the decision, or remand the case to the Commission for further proceedings. § 9–745(e)(1) ("If the court determines that the Commission acted within its powers and correctly construed the law and facts, the court shall confirm the decision of the Commission."); § 9–745(e)(2) ("If the court determines that the Commission did not act within its powers or did not correctly construe the law and facts, the court shall reverse or modify the decision or remand the case to the Commission for further proceedings."). This first method of appealing decisions from the Commission has been labeled the "routine appeal process."

391 Md. 64, 73–74, 891 A.2d 1103, 1108–09 (2006) (footnotes and citations omitted). The Circuit Court reviewed the Commission's interpretation of § 9–632 for legal correctness, or, in other words, engaged in the "routine appeal process." Accordingly, we review the decisions of the Circuit Court and the Court of Special Appeals for legal correctness.

■ Because the Circuit Court was called upon to interpret the Act in reaching its decision to grant summary judgment,

we must bear in mind our "oft-cited principles of statutory construction" in reviewing that decision, while also giving due regard to the interpretation of the Commission. Recently, we reiterated these principles in a case interpreting the Act:

> In interpreting a statute, the overarching objective is to ascertain the legislative intent. The primary source from which to determine legislative intent is the plain meaning of the statutory language. When the plain meaning is clear and unambiguous, and consistent with both the broad purposes of the legislation and the specific purpose of the provision being interpreted, our inquiry ordinarily is at an end. If, after considering the plain language in its ordinary and common sense meaning, two or more equally plausible interpretations arise, however, then the general purpose, legislative history, and language of the act as a whole is examined in an effort to clarify the ambiguity. We will "neither add nor delete words in order to give the statute a meaning...." Because this case involves the Workers' Compensation Act, we also endeavor to interpret its provisions liberally, where possible, in order to effectuate the broad remedial purpose of the statutory scheme.

*W.M. Schlosser Co. v. Uninsured Employers' Fund,* 414 Md. 195, 203–204, 994 A.2d 956, 961 (2010) (quoting *Uninsured Employers' Fund v. Danner,* 388 Md. 649, 659, 882 A.2d 271, 277 (2005)) (citations omitted).

■ The Commission's interpretation of the statute it is charged with administering will be given deference unless its conclusions are based upon an erroneous conclusion of law.

> With respect to reviewing a decision of the Workers' Compensation Commission, we give considerable weight to its interpretation of its statute.... "A court's role in reviewing an administrative agency adjudicatory decision is narrow ... it 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'"

*Schlosser,* 414 Md. at 204, 994 A.2d at 962 (quoting *Maryland Aviation Administration v. Noland,* 386 Md. 556, 571–72, 873 A.2d 1145, 1154–55 (2005)) (citations and footnotes omitted). Our review of this question is, therefore, to determine if the Commission correctly construed the law; specifically, we ask whether the Commission correctly interpreted § 9–632(d) of the Labor and Employment Article. We conclude that it did.

## ANALYSIS

■ In order for the survivor of a deceased, covered employee, to qualify for permanent partial or total benefits under § 9–632 of the Act, the claimant must be either: a dependent, as determined by the Commission; a minor child; or a surviving spouse to whom a legal obligation was owed by the covered employee at the time of the employee's death. § 9–632. Respondent is none of the above. The Court of Special Appeals agreed with Respondent that his deceased wife had "a legal obligation to support" him due to their marriage. That court's holding was rooted in the vestigial doctrine of necessaries as evidenced by what that court found to be the plain meaning and policy of § 10–201 in the Family Law Article. We disagree with that court's holding and rationale. Instead, we hold that no "legal obligation to support," as contemplated under § 9–632, was owed to Respondent because § 10–201 is inapplicable to the facts of the case and no legal obligations to support the surviving spouse arise as a result of the marital tie alone.

■ The Court of Special Appeals determined that this phrase was ambiguous. *Holmes,* 187 Md.App. at 700, 979 A.2d at 750. A phrase is ambiguous when it is capable of two or more equally plausible interpretations. *Webster v. State,* 359 Md. 465, 480, 754 A.2d 1004, 1012 (2000) (noting "we have defined ambiguity as reasonably capable of more than one meaning."). Petitioner asserts that the phrase, "a legal obligation to support," in the context of § 9–632, means an obligation imposed by court order or decree or by agreement between spouses. Respondent contends, however, that the same phrase refers to the natural obligations inherent in the

marital bond as evidenced by § 10–201, and that permanency benefits under § 9–632 would devolve to a spouse unless he or she had agreed to, or were adjudicated to, have given up that right of support. Ballentine's Law Dictionary defines a "legal obligation" as: "[a] debt; an obligation enforceable in an action at law. An obligation to do and perform what the law of the land, as it exists at the time, requires a person to do." BALLENTINE'S LAW DICTIONARY 721 (3d ed.1969). Either of the interpretations of § 9–632(d) asserted above could fit within this dictionary definition of "a legal obligation to support."

■ We agree with the Court of Special Appeals that the phrase, "a legal obligation to support," as used in § 9–632(d), is ambiguous because it is susceptible to two equally plausible interpretations. An appeal to extrinsic considerations is necessary in aid of construction of the statute. *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998) (noting "[i]f, however, the meaning of the plain language is ambiguous or unclear, we seek to discern legislative intent from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based."). To resolve this ambiguity we will look to the general purpose of the Workers' Compensation Act, the legislative history of § 9–632, the Maryland case law, and to other provisions of the Maryland Code.

## I.

■ The Industrial Revolution resulted in frequent and severe injuries to workers. The preamble to Maryland's original Workers' Compensation legislation noted the dangers and costs of the rapidly industrialized workplace: "The State of Maryland recognizes that the prosecution of various industrial enterprises which must be relied upon to create and preserve the wealth and prosperity of the State involves injury to large numbers of workmen, resulting in their partial or total incapacity or death...." Chapter 800 of the Acts of 1914. The Act was promulgated to provide "employees suffering from work-related accidental injuries, regardless of fault, with

a certain, efficient, and dignified form of compensation. In exchange, employees abandoned common law remedies, thereby relieving employers from the vagaries of tort liability." *Polomski v. Baltimore,* 344 Md. 70, 77, 684 A.2d 1338, 1341 (1996) (citations omitted). The Act, unlike tort law, is not designed to make the injured worker whole, but rather to provide financial support following an injury. *Cf. Pineland Lumber Co. v. Miles,* 228 Md. 584, 588, 180 A.2d 870, 872 (1962) (stating "[t]he primary legislative intent was to limit and fix a maximum time within which a compensation award for temporary total disability was to extend."). The purpose, stated in the preamble, was to equitably distribute the burden of workplace accidents among the State, taxpayers, employees, and employers. Chapter 800 of the Acts of 1914.

 The Act is construed "as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes." *Soper v. Montgomery County,* 294 Md. 331, 335, 449 A.2d 1158, 1160 (1982) (citations omitted). In interpreting this statute, however, we should not exceed the intent of the Legislature by granting benefits the General Assembly never intended to create. *Soper,* 294 Md. at 335, 449 A.2d at 1160 (noting that "neither statutory language nor legislative intent can be stretched beyond the fair implication of the statute's words or its purpose.").

Accordingly, in deciding whether the Legislature intended to provide for the survival of benefits to spouses of qualified workers on the basis of the marital tie alone, we should not frustrate the broad remedial purposes of the Act. We should resolve ambiguities in favor of the claimant, while refraining from overreaching the intent of the General Assembly as expressed in the words of the Act itself by granting benefits to a claimant whom the Legislature never intended for the Act to protect. We examine the legislative history of the Act and § 9–632, in particular, to review the context in which these laws were passed and the goals they were intended to advance.

## II.

The Employers and Employees Cooperative Insurance and Liability Article was enacted in 1902 to provide compensation to workers in the mining profession. Chapter 139 of the Acts of 1902. Subsequently, Maryland enacted the Maryland Workers' Compensation Act on April 16, 1914. *See* Chapter 800 of the Acts of 1914. In *Karns v. Liquid Carbonic Corp.*, we noted the work of the executive and legislative branches on the law:

The Maryland Work[ers'] Compensation Act was enacted by Chapter 800 of the Acts of 1914. On May 11, 1913, Governor Phillips Lee Goldsborough appointed a commission "to prepare a bill on the question of Employers' Liability and Workmen's Compensation Laws to be submitted to the General Assembly at its session held in 1914." The report of that commission to the Governor, submitted under date of November 15, 1913, recommended the enactment of the appended statute, said to be the Uniform Workmen's Compensation Act....

275 Md. 1, 6, 338 A.2d 251, 254–55 (1975).

Originally, the Act did not provide for the survival of benefits because they were intended to address the problem of lost income for the individual due to disability, not to compensate dependents or survivors for injury. *Meadowood v. Keller*, 353 Md. 171, 178, 725 A.2d 563, 567 (1999) (quoting 4 LARSON'S WORKERS' COMPENSATION LAW, § 58.42 (1998)) (stating that a workers' compensation award "is a personal one, based upon the employee's need for a substitute for his lost wages and earning capacity."). While initially there was no provision for the survival of benefits beyond the death of a covered employee, the Legislature did provide for the payment of death benefits to the dependents of a worker killed in the course of his or her employment. Chapter 800 of the Acts of 1914, § 35.

A survival provision was added in 1920 as part of a general liberalization of the Act. In the permanent partial disability benefits sub-section, the General Assembly provided that "if

an employee dies, the right to any compensation payable under this Sub-Section, unpaid at the date of his death, shall survive to and vest in his personal representatives." Chapter 456 of the Acts of 1920, § 36. This provision marked a shift from a purely compensatory system to one that acknowledged a surviving property interest in an injured worker's right to receive benefits. The derivative right to the unpaid benefits inured to the employee's personal representatives, i.e. his estate, not to any dependents.

In 1945, the class was expanded to include both surviving dependents and personal representatives. Amendments to the Act in 1945 allowed for the survival of permanent total and hernia benefits, as well as permanent partial disability benefits, "to the employee's surviving dependents as the Commission may determine, if there be such surviving dependents, and if there be none such then to his personal representatives." Chapters 336 and 462 of the Acts of 1945.

Finally in 1947 the phrase "a legal obligation to support" was inserted into the statute giving us the provision at issue in the instant case.

> If an employee dies from any cause or causes not compensable under this Article, the right to any compensation [ ] shall survive to his surviving dependents as the Commission may determine, if there be such surviving dependents, and if there be none such, then to his wife and children under twenty-one years of age *if there was, at the time of his death, a legal obligation on the part of said employee to support his wife, and if there was no such obligation,* then to his children under twenty-one, if any, alone.

Chapter 895 of the Acts of 1947, § 35 (passed by unanimous vote and effective on June 1, 1947) (emphasis added).

The amendment grew out of a report from the Sub-committee on Workers' Compensation of the Legislative Council recommending that Sub-sections (1) and (3) of Section 35 of Article 101 be amended to provide that any unpaid award be paid at the death of an employee only to his surviving dependents, and to cease payments if there were no surviving

dependents. *Reports and Proposed Bills to the General Assembly* 11 (1947–1949). The original bill, S. 252, introduced by Senator Bolton, followed the recommendation of the Subcommittee, omitting the words "and if there be none such then to his personal representative." S. 252, Jan. Sess., at 918–19 (Md.1947). This bill was then amended in the Judicial Proceedings Committee to include the provision at issue in this case, "and if there be none such, then to his wife and children under twenty-one years of age if there was, at the time of his death, *a legal obligation on the part of said employee to support his wife,* and if there was no such obligation, then to his children under twenty-one, if any, alone." S. 252, Jan. Sess., at 1320 (Md.1947) (emphasis added). In removing personal representatives from the class of potential beneficiaries, the Legislature continued in the trend of providing benefits to those persons who depended explicitly on the covered employee's earnings.

There have been no substantive changes to this section despite several re-codifications (in 1957 and 1991) that were limited to making the language gender-neutral and reorganizing the benefit sections to achieve greater clarity. *See Meadowood,* 353 Md. at 183, 725 A.2d at 569 (stating "the 1945 and 1947 legislation put the law essentially into its present posture."); *see also Holmes v.* 187 Md.App. at 704 n. 9, 979 A.2d 744, 753 n. 9 (noting that the provision relating to permanent partial disability became gender neutral in 1991 when it became part of Title 9 of the Labor and Employment Article).

Commenting on the 1947 Amendment in an earlier case dealing with § 9–632, this Court said:

The Legislature left no direct clue as to why, in the 1945 and 1947 legislation, it substituted "surviving dependents" for the personal representative ... Several fair inferences may be drawn, however. With respect to the substitution of dependents, *spouses to whom an obligation of support was owed,* and minor children for personal representatives, the Legislature most likely desired to curtail the continued prospect of unpaid benefits passing either through the employee's will or by intestacy to persons who were not

actually (or in the case of minor children, presumably) dependent on the employee. Indeed, we can fathom no other explanation.

*Meadowood,* 353 Md. 171, 184, 725 A.2d 563, 570 (emphasis added). It is significant that the bill as originally proposed, S. 252, limited survival of benefits to dependents alone. S. 252, Jan. Sess., at 1322 (Md.1947). In addition to addressing who would be entitled to step into the shoes of the deceased covered employee to take his or her benefits, S.B. 252 eliminated the presumption of dependency afforded the wife or minor children of a covered employee. Chapter 895 of the Acts of 1947; *Kendall v. Housing Authority,* 196 Md. 370, 375–376, 76 A.2d 767, 769 (1950) (we stated that "[w]hen the legislature eliminated the [presumption of dependency] we think it left as the only requirement a finding of fact that the claimant was subsisting, and would probably continue to subsist, in whole or in part upon the earnings of the workman at the time of the injury."). Dependency would henceforth be determined solely on the basis of actual support. It may be reasonably inferred, therefore, that the intention of the Legislature in amending the Act was to contract the right to survival benefits, rather than to expand it.

The Legislature crafted a provision for the survival of benefits to wives and minor children of employees, as they would no longer be afforded a presumption of dependency. The Legislature gave an unqualified right to the survival of benefits to minor children in the absence of dependents; however, it chose not to grant the survival of benefits to all spouses, but to limit the right to whomever the employee had a legal obligation to support. § 9–632(d), (e).

Section 9–632 of the Act provides for the limited survival of the derivative right to receive compensation to the dependents, minor children, and spouses of qualified workers who have died of unrelated causes. This Court, in *City of Baltimore v. Cline,* adopted the interpretation of the Court of Special Appeals, which had described the nature of the derivative right that exists under this provision:

[I]t is not the death which is compensable under the statute but rather the injury, and it is the right of the workman himself to collect the benefits unpaid from that injury at the time of his death which survives. Those who take, in the event of his death, take under him, and not independently.

266 Md. 42, 44, 291 A.2d 464, 465 (1972) (quoting *Cline v. City of Baltimore,* 13 Md.App. 337, 340, 283 A.2d 188, 190 (1971)) (citation omitted). The impact of the right being derivative is that a surviving spouse that claims to be a qualified beneficiary of the covered employee's right to compensation "steps into the shoes" of that employee. No party has an independent claim to those benefits under § 9–632.

Because the Legislature did not explicitly define "a legal obligation to support" one's spouse in the Act, and the legislative history of the statute only illuminates alterations to the categories of beneficiaries, we look to the common law of the era to discover the legal context of the concept, "a legal obligation to support."

## III.

When the Act came into effect in 1914, Maryland courts recognized the common law doctrine of necessaries. As Chief Judge Robert Murphy stated in *Condore v. Prince George's Co.,* "[the] [doctrine of necessaries] was an outgrowth of the early common law which placed married women under various disabilities...." 289 Md. 516, 521, 425 A.2d 1011, 1013 (1981) (noting as a result of marriage: merger of legal existence of the wife with the husband, the vestment of her personal property in the husband subject to his creditors, and her inability to contract for services). In *Condore,* we also stated the crux of the legal duty under that doctrine:

Under the common law of Maryland, prior to the adoption of the [Equal Rights Amendment], the husband had a legal duty to supply his wife with necessaries suitable to their station in life, but the wife had no corresponding obligation

to support her husband, or supply him with necessaries, even if she had the financial means to do so.

289 Md. at 520, 425 A.2d at 1012 (citations omitted).

The Court of Special Appeals, in the present case, explained its view of the significance of the term "a legal obligation to support" as used in what is now § 9–632(d) and its relationship to the common law doctrine of necessaries in force prior to the adoption in Maryland of the Equal Rights Amendment:

> The doctrine of necessaries was "an enforcement mechanism for the husband's duty to support his wife." *Cruickshank–Wallace, supra,* 165 Md.App. at 324 [885 A.2d 403]. " 'At common law, failure by the husband to support his wife was not a crime. The husband had an obligation of support, which was to furnish necessaries to his wife. If he did not, her remedy was to purchase the necessaries on his credit.' " *Id.,* (quoting *Ewell v. State,* 207 Md. 288, 292, 114 A.2d 66 (1955)); *accord Dudley v. Montgomery Ward & Co.,* 255 Md. 247, 251, 257 A.2d 437 (1969) (citing *McFerren v. Goldsmith–Stern Co., supra,* 137 Md. [573] at 578 [113 A. 107 (1921) ] (when husband fails to support wife, wife becomes his implied agent to pledge his credit.)).

*Holmes,* 187 Md.App. at 705, 979 A.2d at 753–54. After explaining the court's view of the common law background of the predecessor to § 9–632, the Court of Special Appeals came to the following conclusions:

> When the statutory predecessor to § 9–632(d) was enacted in 1947, Maryland law recognized that husbands generally had an affirmative, enforceable legal obligation to support their wives, an obligation that arose "by reason of the marital tie." *Dudley v. Montgomery Ward, supra,* 255 Md. at 249 [257 A.2d 437]. We conclude that, when the General Assembly used the term "a legal obligation on the part of said employee to support his wife," it intended to describe this duty, as opposed to a specific requirement imposed by court order or written agreement.

*Holmes,* 187 Md.App. at 707–08, 979 A.2d at 755.[6]

We agree with the Court of Special Appeals that in 1947, prior to the Equal Rights Amendment, the common law doctrine of necessaries provided an "enforcement mechanism" by which a creditor could pursue satisfaction of the wife's debts against the husbands resources. The intermediate appellate court cited *Dudley v. Montgomery Ward Co.,* 255 Md. 247, 249, 257 A.2d 437, 440 (1969), for the proposition that, in 1947, a husband had an "affirmative, legal obligation" to support his wife by reason of the marital tie alone. *Holmes,* 187 Md.App. at 707, 979 A.2d at 755. The intermediate appellate court, however, has read *Dudley* too broadly. Taken in context, *Dudley* merely states that a necessary precondition to liability in an action against a man under the doctrine of necessaries was a valid, continuing marriage to the person who had purchased items for her own support on his credit:

> Generally, a husband has a duty to support his wife and if he fails to do so will be liable to pay one who furnishes the wife necessaries even though the couple are living apart voluntarily or without the fault of the wife. We need not discuss or decide the theories variously relied on to impose this liability on the husband. One view—apparently the Maryland view, is that the wife becomes an agent of the husband to pledge his credit. This agency has been called

---

**6.** The Court of Special Appeals drew support for its conclusion in the present case from three cases where it determined that this Court equated the term "a legal obligation to support" with an obligation arising out of the marital tie. Section 9–632(d), however, was not at issue in those cases. Each case references an iteration of the phrase, "[a] legal or moral obligation to support someone, in the absence of actual support, does not create dependency" in the context of reasoning with regard to whether the claimant was a dependent for the purposes of the Act. *See Mullan Construction Co. v. Day,* 218 Md. 581, 586, 147 A.2d 756, 759 (1959); *Mario Anello & Sons, Inc. v. Dunn,* 217 Md. 177, 180, 141 A.2d 731 (1958); *Havre De Grace Fireworks Co. v. Howe,* 206 Md. 158, 164, 110 A.2d 666 (1955). The statement that the Court of Special Appeals references does not indicate that we were adopting the view that "a legal obligation to support" arises out of marital status, but rather that evidence of a legal obligation owed to a spouse is insufficient to constitute dependency under § 9–632 in the absence of actual support.

"implied," "of necessity" and "compulsory." The Restatement—Restitution—suggests that the true basis may be the rules making up the doctrine of unjust enrichment. Whatever its sound basis, this liability of the husband arises and continues by reason of the marital tie . . .

*Dudley,* 255 Md. at 251, 257 A.2d at 439–440 (citations and footnote omitted).

The duty to provide necessaries was imposed by law only when the circumstances giving rise to that duty existed. Marriage was not the only precondition for taking remedial action against the husband: the husband must have failed to provide for his wife; husband and wife must have been living together, or separately through no fault of the wife; and the wife must have purchased items necessary to her support on his credit, only then could a creditor bring a successful action. *Dudley,* 255 Md. at 253 fn. 4, 257 A.2d at 441 fn. 4. The duty was not limitless, as this Court noted in *Dudley,* "[w]hen that [marital] tie is severed by a court or when the wife misbehaves to a point which would permit the husband to obtain its severance, his obligation to pay for supplied necessaries terminates completely." 255 Md. at 251–52, 257 A.2d at 440 (citation omitted).

While the Legislature may have been contemplating the doctrine of necessaries, and its root in social norms in the late nineteenth and early twentieth centuries, when it used the language "a legal obligation to support" in § 9–632(d), there is no evidence in legislative history or case law to suggest that the obligation arises independently of that doctrine, or of a contractual agreement, or court order. If the General Assembly had intended for "a legal obligation to support" to arise as a result of the marriage alone, it could have omitted the qualifying language "a legal obligation on the part of said employee to support his wife." Chapter 895 of the Acts of 1947. Instead, drafters could have provided for the survival of benefits to all spouses or the wife, with specific exceptions, such as the exception in § 9–680(a) barring a wife who had deserted her husband for more than a year from receiving compensation under the Act. It is clear that the Legislature

intended to identify a sub-set of surviving spouses, and not all spouses, who should receive a decedent spouses's benefits. As we have stated previously, the court "will neither add nor delete words in order to give the statute meaning. . . ." *Schlosser*, 414 Md. at 204, 994 A.2d at 961 (quotation omitted). Maryland common law does not support the inference that an affirmative, legal duty arises solely out of the existence of a marital relationship.

## IV.

 In 1947, an obligation to provide for a spouse, on the part of the husband only, was legally imposed by the doctrine of necessaries, but in 1981, that doctrine was abolished by this Court in *Condore*, 289 Md. at 532–33, 425 A.2d at 1019, wherein we stated that "the ancient necessaries doctrine, violative as it is of the ERA, is no longer part of the common law of this State and neither the husband nor the wife is liable, absent a contract, express or implied, for necessaries such as medical care supplied to the other." [7] Therefore, that doctrine may not be implicitly resuscitated in order to create a legal obligation to support under either § 9–632(d) or § 10–201 of the Family Law Article, discussed *infra*. The obligations of Article 46 of the Maryland Declaration of Rights are strictly enforced in Maryland. *Rand v. Rand*, 280 Md. 508, 511–12, 374 A.2d 900, 902–03 (1977) (stating "[t]he words of the ERA are clear and unambiguous. . . . This language mandating equality of rights can only mean that sex is not a factor."). Our courts have taken this mandate seriously and have struck down as unconstitutional a number of family and spousal support laws. *See, e.g., Condore*, 289 Md. 516, 425 A.2d 1011 (abrogating the doctrine of necessaries); *Rand*, 280 Md. 508, 374 A.2d 900 (holding that the parental obligation to provide child support is shared equally by both parents); *Coleman v. State*, 37 Md.App. 322, 377 A.2d 553 (1977) (holding that the

---

7. Article 46 of the Maryland Declaration of Rights, ratified in 1972, states that "[e]quality of rights under the law shall not be abridged or denied because of sex." Md. Const. Decl. of Rights, art. 46.

criminal non-support statute unconstitutional after passage of the ERA).

In *Condore*, this Court considered whether a wife had a legal duty to provide for the necessary expenses of her husband under the common law doctrine of necessaries, as modified by the ERA. 289 Md. at 517, 425 A.2d at 1011. We held that both the common law and statutory doctrines of necessaries were unconstitutional under the ERA. *Condore*, 289 Md. at 530, 425 A.2d at 1018 (holding that "[t]he common law doctrine of necessaries is predicated upon a sex-based classification which is unconstitutional under the ERA ... the provisions of [Art. 45, § 21] relating to the husband's liability for his wife's necessaries, being declaratory of the common law rule, are also invalid under the ERA.").

We were then left with a choice: to fashion a new, gender-neutral version of the doctrine of necessaries, or to abrogate the doctrine in its entirety and allow the General Assembly to decide whether to fashion such a rule.

Although frequently importuned to do so, the legislature has not changed the common law necessaries doctrine, as reflected in Art. 45, § 21. As stated in the 1978 Report of the Governor's Commission to Study Implementation of the Equal Rights Amendment, between 1973 and 1976 a number of bills were introduced in the General Assembly to remove sex discrimination from the common law necessaries doctrine. Some of the bills took the approach of eliminating the doctrine of necessaries and some sought to extend it to both spouses. In 1978, a bill was introduced to sex-neutralize the law relating to necessaries, and to permit the "home-making spouse" of either sex to pledge the credit of the other. None of the bills was enacted. Contrasted with this legislative inaction, the General Assembly has, as we have already observed, sex-neutralized criminal statutes pertaining to spousal non-support and desertion, as well as the obligation to pay alimony which, historically, was based on the common law duty of the husband to support his wife. *See Bender v. Bender*, 282 Md. 525, 386 A.2d 772 (1978). Like alimony, the historical basis underlying the necessaries

doctrine was the husband's unilateral duty to support his wife.

*Condore,* 289 Md. at 531, 425 A.2d at 1018–19. In light of the difficult policy choices presented, and the evident legislative disagreement over their resolution, we chose to abolish the doctrine of necessaries from the common law:

> [R]ather than judicially expand the common law doctrine by creating a new reciprocal liability upon the wife, pending legislative consideration of the matter, we conclude that the ancient necessaries doctrine, violative as it is of the ERA, is no longer part of the common law of this State and that neither the husband nor the wife is liable, absent a contract, express or implied, for necessaries such as medical care supplied to the other.

*Condore,* 289 Md. at 532–33, 425 A.2d at 1019.

The ERA did not create corresponding gender-neutral rights and obligations to all gender specific rights and obligations that had previously existed. The ERA instead rendered those laws unenforceable and unconstitutional. *Condore,* 289 Md. at 530–32, 425 A.2d at 1018–19 (discussing the effect of the ERA on various doctrines, and the responses of the courts and Legislature). The General Assembly thereafter specifically reenacted those laws it chose to preserve in a gender-neutral and constitutional fashion. *See Cruickshank–Wallace,* 165 Md.App. at 325–27, 885 A.2d at 418–19. The Legislature chose to continue to prohibit the willful non-support of a spouse where there is an ability to provide support, but the Legislature did not choose to compel the support of a spouse, except by virtue of a legally enforceable agreement for support or alimony, or pursuant to court order. There is presently no affirmative legal duty owed by one spouse to support the other spouse, absent a court order or a legally enforceable contractual agreement for support. *Cf. Blum v. Blum,* 295 Md. 135, 141–42, 453 A.2d 824, 827–28 (1983) (noting that an obligation to pay alimony or contractual spousal support is a legally enforceable duty to provide "intra-

familial support" emanating from the decree of a court of competent jurisdiction).

The Workers' Compensation Act was not designed to serve as an independent spousal support law. The purpose of the Act is to ensure that dependents, or persons with important characteristics in common with dependents, i.e., surviving spouses to whom are owed a duty of support, are not left to the mercy of the State. *See generally* Arthur Larson, *The Nature and Origins of Workmen's Compensation*, 37 CORNELL L.Q. 206, 209–10 (1952) (discussing the underlying social philosophy of Workers' Compensation Laws). Section 9–632(d) clearly contemplates an obligation that has been imposed by a court order or by lawful agreement and the Commission correctly viewed it that way. The survival of a right to collect benefits is intended to provide security for the dependents or others designated in § 9–632, who are suddenly left without a means of support, following the death of an injured worker. The right to compensation under " § 9–632 is derivative: 'it is not the death which is compensable under the statute but rather the injury, and it is the right of the workman himself to collect the benefits unpaid from that injury at the time of his death which survives.' " *Keller*, 353 Md. at 174, 725 A.2d at 565 (citation omitted). If there had been an existing underlying duty of one spouse to support the other, as Judge Rodowsky argued in his dissent in *Condore*, 289 Md. at 543–46, 425 A.2d at 1019–30, we would have extended the doctrine of necessaries to both spouses. By declining to extend the doctrine of necessaries, *Condore* implicitly rejected the notion that an affirmative duty of spousal support exists by virtue of the marital tie alone. As the Court of Special Appeals explained in *Hofmann v. Hofmann:*

> Chief Judge Murphy, for the Court, explained in *Condore* that the common law of Maryland prior to the adoption of Article 46 of the Declaration of Rights was that a husband was under "a legal duty to supply his wife with necessaries suitable to their station in life ..." 289 Md. at 520, 425 A.2d at 1013. The wife, however, was not under a similar obligation to the husband irrespective of her financial ability

to meet similar obligations. Thus, *even if the wife were a millionaire and her husband a pauper, the wife was under no legal duty to pay for the husband's necessaries.*

Had the duty of supplying necessaries run from the wife to husband as well as from husband to wife, *Condore* would have been decided differently.

50 Md.App. 240, 243, 437 A.2d 247, 249 (1981) (emphasis added, citations omitted).

An obligation to provide one's spouse with love, respect, and moral support is inherent in every marriage. An obligation can only be 'legal,' however, when it is susceptible to legal enforcement. A duty without a means for enforcing it is not a legal duty at all. By abrogating the doctrine of necessaries in *Condore*, this Court merely eliminated one vehicle for the legal enforcement of spousal support. The General Assembly affirmed the choice a spouse has to seek alimony or criminal non-support, by failing to reenact a sex-neutral version of the doctrine of necessaries. *See Cruickshank–Wallace,* 165 Md. App. at 327, 885 A.2d at 419 (noting "in 1989, the General Assembly declined to create such a cause of action, and repealed the already-void statutory codification of the doctrine.").

### V.

Consistent with the Court of Special Appeals's opinion in the present case, Respondent maintains that § 10–201 of the Family Law Article, which punishes the willful non-support of a spouse as a misdemeanor, implicitly establishes a legal obligation of one spouse to provide for the support of the other spouse by virtue of the marital tie. Respondent argues that the popular and plain understanding of the marriage relationship includes an obligation to provide support. Thus, according to Respondent, because of the legal obligation to support, implicit in § 10–201, Mrs. Holmes, on the date of her death, had a legal obligation to support her surviving spouse within the meaning of § 9–632(d) of the Labor and Employment Article. We hold, however, that at the time of Mrs.

Holmes's death, Mr. Holmes, under § 10–201, had no legally enforceable rights in this regard, and Mrs. Holmes had no corresponding legally enforceable duties. In other words, neither Mr. Holmes nor Mrs. Holmes had a right to sue the other in a civil proceeding for a violation of § 10–201. Section 10–201 and § 9–632 are two separate and distinct statutes. Section 10–201 is a criminal statute, not a civil one.[8]

Section 10–201 of the Family Law Article provides:

(a) *In general.*—A spouse *may not willfully fail to provide for the support of the other spouse,* without just cause.

(b) *Penalties.*—An individual who violates this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $100 or imprisonment not exceeding 3 years or both.

(c) *Disposition of fine.*—If an individual is convicted under this section, the court may order the individual to pay any fine wholly or partly to the spouse.

(Emphasis added.).

To support his contention that § 10–201 of the Family Law Article created an affirmative, legal duty to provide spousal

---

**8.** According to the dissenting opinion, the meaning of the phrase, "a legal obligation to support" in the Workers' Compensation Act can be drawn from § 10–201 of the Family Law Article, a provision, which, the dissent maintains, is based on the pre-existing legal duty of spousal support. The dissent conflates § 9–632 and § 10–201, which have wholly distinct purposes and histories. Section 10–201 does not create a private cause of action for either spouse based on a legal duty to support, it only allows the State to seek a penalty. In our view, to hold otherwise would result in the creation, by this Court, of a new right for spouses to bring civil suits against one another to claim violation of the duty to support. It is clear that this was not the legislative intent of the General Assembly in passing the criminal nonsupport statute. Where the legislature has intended to create a private cause of action for violations of a statute, it has done so explicitly. *See e.g.,* Md.Code (2006), § 13–408(a) of the Commercial Law Article (providing a private right of action to individuals aggrieved by violations of the Consumer Protection Act). After the abrogation of the doctrine of necessaries, discussed *supra,* there is no common law duty of support, nor is there a statutory duty to affirmatively provide support. Section 10–201 does not provide the legal basis for a surviving spouse's claim to workers' compensation benefits.

support by virtue of the marital tie alone, Respondent relies upon *Cruickshank–Wallace,* and specifically the following language:

> When William conveyed the tax refunds to Bonnie, they were living in an intact family with their children. [ ] Moreover, both William and Bonnie had a legal obligation not to willfully fail to support the other, if capable of rendering support. Their situation was not as it was pre-*Condore,* when it was the husband's sole and non-reciprocal legal duty to support his wife by furnishing necessaries for her and their children. Rather, Bonnie had the same obligation to support the children and to support herself and William as he had to support Bonnie, the children, and himself. The payment of household expenses and support of the children was as much Bonnie's duty as it was William's duty.

165 Md.App. at 335, 885 A.2d at 424 (emphasis added).

 Section 10–201 does not support Mr. Holmes's interpretation of the Workers' Compensation statute. Respondent has erroneously abstracted an affirmative, legal obligation to *provide* support from a duty *not to willfully fail* to provide support. *Cruickshank–Wallace* does not hold that a reciprocal and affirmative duty to support exists between a husband and wife, and to the extent that it does we disavow that assertion. The court in *Cruickshank–Wallace* states correctly that both parties have a duty not to willfully fail to support the other. 165 Md.App. at 335, 885 A.2d at 424. In other words, in Maryland, spouses may not voluntarily impoverish one another, if capable of rendering support. The determination of the amount or extent of that support, however, is left to an adjudication by a court of competent jurisdiction, provided there is an evidentiary basis to support the elements of the statute.

The criminal non-support statute was first enacted in 1896. Chapter 73 of the Acts of 1896. Since then, amendments to the provision have been limited to the following: separating out the offense of desertion, § 10–219 of the Family Law

Article, from criminal non-support, and separating non-support of a spouse, from non-support of a child, § 10–203 of the Family Law Article. This Court noted the purpose of non-support statutes in *State v. James:*

[T]he purpose of a non-support statute is not only to prevent a neglected wife [ ] from becoming a public charge, but that the higher and more important purpose of the Legislature was to assist deserted or neglected wives [ ] in directly procuring support, to punish the infliction of this kind of wrong upon them, and by the fear of such punishment to deter husbands [ ] from leaving their families to endure privation.

203 Md. 113, 122, 100 A.2d 12, 15 (1953).

The criminal non-support statute reflects a public policy to promote responsibility for the support of spouses and children within the family unit. At the time of passage of the law in 1896, the provision was found in the "Crimes and Punishments" article of the Code of Public General Laws under the subtitle "Desertion of Wife or Child." Chapter 73 of the Acts of 1896 (stating "[a]ny person who shall without just cause desert or willfully neglect to provide for the support and maintenance of his wife or minor child, shall be deemed guilty of a misdemeanor ..."). In 1977, the phrase "desert" was removed so that only non-support, and not desertion itself, constituted a crime. *Report of the Governor's Commission to Study Implementation of the Equal Rights Amendment,* Sec. L.(July 1, 1978). The Governor's Commission to Study Implementation of the Equal Rights Amendment ("ERA Commission") proposed decriminalization of non-support, and two bills were introduced between 1974 and 1977 to do just that neither emerged from the Judiciary Committee. *ERA Commission Report,* Sec. L. (noting that H.B. 1144, introduced in 1974, would have repealed criminal provisions relating to desertion and non-support of wife and children and H.B. 1532, introduced in 1976, would have decriminalized non-support of spouses and established uniform civil procedures). The ERA Commission proposed to replace the non-support statute with a "sex neutral non-support statute which would provide a

readily accessible remedy to all women, especially low-income women, for the collection of child and spousal support." *ERA Commission Report,* Sec. L. The criminal statute persevered and in 1978, through the passage of H.B. 1170, the crime of non-support of a spouse was extended to both sexes. Chapter 921 of the Acts of 1978. The evolution of the statute, and the persistent criminal penalty inherent therein, is evidence that the policy to deter wilful neglect of familial duties is the goal of the statute.

The statutory caveat "without just cause" further supports our interpretation that the statute does not create an enforceable civil duty, but helps to prescribe a scope to the actions or inaction that might evoke a criminal penalty. If there is a civil duty to support, it would arise only under a finite set of circumstances, namely those in which a spouse did not have a just cause for his or her particular actions. In describing the parameters of § 10–201, this Court explained:

> To be guilty under the statute, the husband must wilfully fail to provide for his wife without just cause. The term "wilfully" in criminal statutes has been said "to characterize an act done with deliberate intention for which there is no reasonable excuse." If the conviction is to be sustained, there must have been testimony from which the trier of the facts could have determined that the husband intentionally refused to support his wife, although he had the capacity to do so. The cases have held that wilful failure to support presupposes the existence of, or the ability to obtain, the means of support by the husband. He must have the means or the capacity to obtain them.

*Ewell v. State,* 207 Md. 288, 299, 114 A.2d 66, 72 (1955) (citations omitted).

As Petitioner rightly contends, § 10–201 cannot be read to create a general, mutual legal obligation to support a spouse by virtue of the marriage alone in light of its purposes to create a statutory offense with a prescribed set of elements and a sanction for committing criminal non-support. We reiterated the remedial purpose and public policy underlying

§ 10–201 in *State v. Berry*, 287 Md. 491, 413 A.2d 557 (1980). In that case, a man who had a conviction under § 10–201 for non-support of his wife and two children was charged with violating the terms of his probation, which was conditioned upon his making weekly support payments to them as ordered by the court. *Berry*, 287 Md. at 494, 413 A.2d at 560. Section 10–201 imposes a legal obligation to pay support in a marriage when a court of competent jurisdiction has determined that the factual circumstances of the case correlate to the elements of the provision and the purposes of the law. The purposes of the law, as we stated in *Berry*, are to "to assist spouses and children in directly procuring support and thereby preventing them from becoming public burdens, to punish the offense of failing to provide support, and, by the fear of punishment, to prevent the commission of such an offense." *Berry*, 287 Md. at 497, 413 A.2d at 561 (in line with the purposes of the statute, Mr. Berry was placed on probation precisely because it would allow him to continue to make support payments, which could not have done if the punishment had been incarceration). Thus it is clear that this Court has not read the statute to announce an affirmative, legal obligation by virtue of the marriage alone absent a court order to pay support, such as the one the defendant in *State v. Berry* had, which led to his probation.

Respondent is correct in his argument that the non-support statute applies equally to husbands and wives; however, because § 10–201 is inapplicable to the facts of this case that is immaterial. The Equal Rights Amendment to the Maryland State Constitution required legislative action to address the sex-based distinctions inherent in the crime of spousal nonsupport. Md. Dec. of R. art. 46. The Court of Special Appeals held in *Coleman*, that the non-support statute (Chapter 73 of the Acts of 1896, § 88(a)) was unconstitutional under the ERA because it penalized only men who refused to support their wives (and not women who refused to support their husbands). *See generally Coleman*, 37 Md.App. 322, 377 A.2d 553 (1977). Legislative amendments quickly followed, "[i]n 1978, the General Assembly amended the criminal non-support statutes to

place responsibility for family support on both spouses." *Cruickshank–Wallace,* 165 Md.App. at 326, 885 A.2d at 418; *see* Chapter 921 of the Acts of 1978.

In the instant case, it is clear that Mrs. Holmes could not have met the requirements of § 10–201 because she was incapable of providing support. Near the time of her death, Mrs. Holmes had no earning power whatsoever. She was not working just prior to the time of her death on December 4, 2006, and her approximately $300 workers' compensation benefits had expired on November 28, 2006. Therefore, she could not have been in violation of § 10–201, and was under no legal duty within the meaning of § 9–632(d) of the Labor and Employment Article to support her husband.

The only *legal* duties to provide support are those specifically enumerated in the Maryland Code, such as alimony, according to §§ 11–101–11–112 of the Family Law Article, child support, according to §§ 12–101–12–204 of the Family Law Article, and payment of support as determined by a court of competent jurisdiction upon a conviction for willful failure to provide support, according to §§ 10–201, 10–203 of the Family Law Article. The existence of these duties is contingent upon a specific statutory criteria that is independent of the marital tie. Ordinarily, the duty to support a spouse arises from a legal agreement to provide support or alimony, or a court order or decree rendered by a court of competent jurisdiction. *See Blum,* 295 Md. at 141, 453 A.2d at 827–28 (citing *Brown v. Brown,* 287 Md. 273, 412 A.2d 396 (1980)).

In the context of the criminal non-support laws, application of the criminal non-support statute involves more than just the marital tie. It involves the State's Attorney's exercise of prosecutorial discretion. Md.Code (2001, 2008 Rep. Vol.), § 15–102 of the Criminal Procedure Article (the State's Attorney "shall prosecute and defend ... all cases in which the State may be interested."); *see Ewell v. State,* 207 Md. at 296–97, 114 A.2d at 71 (stating "[w]e think that the practice of the state's attorney of Baltimore in not prosecuting cases of non-support in which the wife has funds, if such practice had been

proven, would amount to no more than the exercise of his discretion ...". Even if there is sufficient evidence of voluntary impoverishment on the part of one spouse toward the other, the State would be required to show the absence of just cause. Accordingly, that would require proof of the ability to pay, and if there were no ability to pay, there would be no affirmative duty. Therefore, the criminal statute under consideration, § 10–201, would not constitute a safe harbor for the purpose of inferring an affirmative civil duty to provide support. At best, any duty would be contingent.

## Conclusion

It is clear that when the General Assembly enacted § 9–632(d), one source of the term, "a legal obligation to support" arose by reason of the doctrine of necessaries, which was abolished by *Condore.* No other affirmative, legal obligation to support a spouse, solely by virtue of the marital tie and independent of the doctrine of necessaries, existed or now exists in Maryland case law. Mrs. Holmes was not criminally, willfully failing to support her husband because she had no income at the time of her death. Moreover, a criminal prosecution after the fact of her death would be impossible. The only other source of a legal obligation of one spouse to another is a legally enforceable contract, decree or order from a court of competent jurisdiction. Because Respondent failed to introduce any evidence of the existence of a legal duty to support him on the part of Mrs. Holmes, Mrs. Holmes's right to receive a compensation benefit does not pass to Respondent under § 9–632(d) of the Labor and Employment Article of the Maryland Code.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. RESPONDENT TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**

BELL, C.J., and ADKINS, J., dissent.

ADKINS, J., dissenting.

I respectfully dissent from the majority's interpretation of § 10–201 of the Family Law Article and consequent holding that "[t]here is presently no *affirmative* legal duty owed by one spouse to support the other spouse, absent a court order or a legally enforceable contractual agreement for support." [1] Maj. op. at 373, 7 A.3d at 29 (emphasis in original). In its opinion, the majority reasons that § 10–201 "cannot be read to create a general, mutual legal obligation to support a spouse by virtue of the marriage alone in light of its purposes to create a statutory offense with a prescribed set of elements and a sanction for committing criminal non-support." Maj. op. at 379, 7 A.3d at 33. This statement, however, ignores a fundamental principle of law: "For criminal liability to be based upon a failure to act it must first be found that there is a duty to act—a *legal duty* and not simply a moral duty." 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.2(a) (2nd ed.2003) (emphasis added); *see also United States v. Bonetti*, 277 F.3d 441, 447 (4th Cir.2002) ("[A] breach of a *legal duty,* rather than a mere moral command, is necessary to impose criminal liability for a failure to assist one in need.") (emphasis added); *People v. Heitzman,* 9 Cal.4th 189, 37 Cal.Rptr.2d 236, 886 P.2d 1229, 1233–34 (1994) ("Unlike the imposition of criminal penalties for certain positive acts, which is based on the statutory proscription of such conduct, when an individual's criminal liability is based on the *failure* to act, it is well established that [he] must first be under an existing *legal duty* to take positive action.") (emphasis added).

Here, instead of focusing on a spouse's duty to provide support, the majority zeroes in on the other spouse's *right to*

---

[1] I do agree with the majority, however, that § 10–201's prohibition against a spouse's willful failure to provide support means that "spouses may not voluntarily impoverish one another, if capable of rendering support." Maj. Op. at 377, 7 A.3d at 32. In other words, the statute penalizes a spouse who withholds support, when he or she is capable of supplying it and has no other just cause for withholding it, from a spouse that would otherwise be destitute without it. I depart from the majority when it imposes a threshold requirement of court-ordered or contractually agreed upon support before a legal obligation to support can exist.

*receive* support, and ascribes the limitations it finds there to the former:

> We hold ... that at the time of Mrs. Holmes's death, Mr. Holmes, under § 10–201, had no legally enforceable rights, and Mrs. Holmes had no corresponding legally enforceable duties. In other words, neither Mr. Holmes nor Mrs. Holmes had a right to sue the other in a civil proceeding for a violation of § 10–201.

Maj. Op. at 375–76, 7 A.3d at 30–31; *see also* Maj. Op. at 367–75, 7 A.3d at 25–30 (discussing the doctrine of necessaries and this Court's abrogation of that common law rule following the enactment of the ERA). The majority reasons that because the elimination of the common law doctrine of necessaries has foreclosed a spouse's ability to enforce spousal support in situations where there was no prior court order or contractual agreement for support, the other spouse has no legal obligation to provide support. *See* Maj. Op. at 375, 7 A.3d at 30 ("A duty without a means for enforcing it is not a legal duty at all.").

In so doing, the majority overlooks one important party to every marriage contract: the *State*. *See State v. Lynch*, 301 N.C. 479, 272 S.E.2d 349, 353 (1980)("There are three parties to a marriage contract—the husband, the wife and the State."). Section 10–201 vests the authority to enforce spousal support in the State by criminalizing the willful failure to provide support. As the majority explains, the State has an interest in preventing spouses and children from becoming public burdens. *See* Maj. Op. at 380, 7 A.3d at 33 ("The purposes of the law ... are to assist spouses and children in directly procuring support and thereby preventing them from becoming public burdens, to punish the offense of failing to provide support, and, by the fear of punishment, to prevent the commission of such an offense.") (citation and quotation marks omitted). Thus, the relevant reciprocal relationship is not between Mr. and Mrs. Holmes' respective rights and duties, as the majority suggests. Rather, the legal right that corresponds with, and thus gives rise to, a spouse's duty to support is the State's inherent interest in protecting the spouse from becoming dependent on the State for support.

The express language of the statute further bolsters my view. The well-established principles of statutory construction demand that, in our endeavor to "ascertain and effectuate the intention of the legislature ... we look first to the language of the statute, giving it its natural and ordinary meaning. This step is the point in statutory construction with which the search for legislative intent begins, and ordinarily ends." *Maryland–National Capital Park & Planning Comm'n v. Anderson,* 395 Md. 172, 182, 909 A.2d 694, 699–700 (2006) (quotation marks and citations omitted).

> The statutory language itself provides the clearest indication of the legislative intent and is thus the primary source for all statutory construction. We also adhere to the principle that the court should confine itself to construing the statute according to the ordinary and natural signification of the words used without resorting to subtle or forced interpretations designed to limit or extend the operation of the statute.

*State v. Berry,* 287 Md. 491, 495, 413 A.2d 557, 560 (1980) (citations omitted). Yet, despite this settled cannon of interpretation, the majority reads into § 10–201 a threshold "court-ordered spousal support" requirement where there is none, to justify its theory that, at the time of her death, Mrs. Holmes did not have any legal obligation to support her husband. Here, § 10–201 does not contemplate a court order until *after* a spouse has been convicted under that section. *See* § 10–201(c) ("If an individual is convicted under this section, the court may order the individual to pay any fine wholly or partly to the spouse."). Nowhere in § 10–201 does the General Assembly mention a pre-existing court order or contractual obligation.

The majority's opinion ignores this significant omission, and instead draws hollow sustenance from *State v. Berry* to reach the conclusion that "it is clear that this Court has not read the statute to announce an affirmative, legal obligation by virtue of the marriage alone absent a court order to pay support[.]" Maj. op. at 380, 7 A.3d at 33. The flaw in this reliance is that the defendant in *Berry* was not placed on probation, and the

relevant court order directing spousal support did not exist, until *after* the defendant was convicted for violating the criminal nonsupport statute:

> On March 7, 1973, Donald E. Berry was convicted on a guilty plea in the Criminal Court of Baltimore of nonsupport of his wife and two children. He was sentenced to eighteen months imprisonment for both offenses. However, the execution of this sentence was suspended, and he was placed on probation for three years, commencing March 7, 1973, conditioned upon his making weekly support payments as ordered by the court.

*Berry,* 287 Md. at 494, 413 A.2d at 559; *see also Berry v. State,* 41 Md.App. 563, 563–564, 398 A.2d 59, 60 (1979) (explaining that the defendant's original conviction was pursuant to Article 27, Section 88, the precursor to § 10–201). In that case, no mention of any earlier court order is made in the opinions of either this Court or the Court of Special Appeals. Regardless, even if the defendant had been subject to court-ordered support prior to his violation of the nonsupport statute, the mere fact that this Court has yet to entertain cases where there is no previous order of support does not establish a rule. The primary consideration is always the language of the statute.

Finally, although I do not accept the majority's view that a court order or a contract is the gatekeeper to legal liability under § 10–201, I do agree that the statute's "without just cause" clause narrows the situations in which a legal duty exists. Thus, if a spouse has just cause not to provide support, he or she is under no legal obligation to do so. Generally, a spouse's "just cause" would be the inability to pay support or the other spouse's ability to survive without it.[2] Moreover, I, like the majority, believe that "[t]he determination of the amount or extent of that support . . . is left to an

---

**2.** There may be other instances where a spouse is not under a legal obligation to support the other. For example, a spouse's physical or emotional abuse of his or her partner may trigger the "just cause" exception.

adjudication by a court of competent jurisdiction, provided there is an evidentiary basis to support the elements of the statute." Maj. op. at 377, 7 A.3d at 32. Thus, I would order that this case be remanded to the Circuit Court for Baltimore City to determine whether, at the time of her death, Mrs. Holmes had the means to support her husband, and whether he needed that support.[3]

The majority, however, cuts off this inquiry by concluding that Mrs. Holmes did not possess the means to support him because her disability benefits had expired a few days before her death. *See* Maj. op. at 382, 7 A.3d at 34 ("Mrs. Holmes was not criminally, willfully failing to support her husband because she had no income at the time of her death."). Yet, Mrs. Holmes would have been entitled to apply for additional benefits had she continued to live. Indeed, the majority's holding that spouses may not *willfully* impoverish one another indicates that Mrs. Holmes would have been under a duty to apply for benefits if she was able to do so and had no other source of income. If she had succeeded in procuring those benefits, and Mr. Holmes could not survive without her support, then she was under a legal obligation to provide it, thus satisfying § 9–632 of the Labor and Employment Article. Ultimately, these findings are best determined by a trier of fact.

For these reasons, I dissent from the majority opinion.

Chief Judge BELL authorizes me to state that he joins in the views expressed in this dissenting opinion.

---

3. Mr. Holmes was the only witness to testify at the Commission hearing below. He testified that he combined his income with Mrs. Holmes's disability benefits in order to meet their living expenses. If uncontested, this evidence may establish that Mr. Holmes relied upon Mrs. Holmes for survival, thus satisfying one of § 10–201's requirements.